**2022 UT App 114**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF
A.H., J.H., J.H., L.H., N.H., S.H., AND E.H.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

N.J.H. AND S.H.,
Appellants,
*v.*
STATE OF UTAH,
Appellee.

Opinion
Nos. 20210353-CA and
20210354-CA
Filed October 6, 2022

Fourth District Juvenile Court, Provo Department
The Honorable Suchada P. Bazzelle
No. 1145453

Alexandra Mareschal, Attorney for Appellant N.J.H.

Kirstin H. Norman, Attorney for Appellant S.H.

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGE DAVID N. MORTENSEN and SENIOR JUDGE KATE APPLEBY
concurred.[1]

---

1. Senior Judge Kate Appleby sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

HARRIS, Judge:

¶1     After a bench trial, the juvenile court terminated S.H.'s (Mother) and N.J.H.'s (Father) (collectively, Parents) parental rights regarding the two youngest of their seven children: A.H. and L.H. (the Subject Children). The court did not terminate Parents' rights regarding their other five children; it accepted the parties' stipulation that the best interest of those children would be served by placing them in a guardianship with relatives. But despite those same relatives being willing to take and care for (by either adoption or guardianship) the Subject Children as well, the court determined that the Subject Children's best interest would be served by termination of Parents' rights and adoption by their foster parents. In separate appeals that we consider together in this opinion, Parents challenge that decision, asserting that termination of their rights was neither strictly necessary nor in the best interest of the Subject Children. We agree and reverse.

BACKGROUND

¶2     Mother and Father are the parents of seven children (the Children), each born approximately two years apart. The eldest (E.H.) was born in 2005, and the two youngest (A.H. and L.H.) were born in February 2015 and December 2016, respectively. Mother is the biological parent of all seven of the Children. Father is the biological parent of the six youngest Children and the legal parent of all of them; he adopted E.H. when E.H. was an infant. Mother and Father met in New Mexico, which is where the

parents of E.H.'s biological father (Grandparents) live.[2] Parents moved to Utah, with the Children then born, in 2007.

¶3 Over the years, Grandparents developed a close relationship not only with E.H.—their biological grandson—but with the other Children as well. They made trips to Utah on at least an annual basis during which they spent time with the Children, and they engaged in regular telephonic contact as well. After L.H. was born in 2016, he required a lengthy stay in the newborn intensive care unit, and Grandmother took three weeks off from her job as a nurse to come to Utah and help.

¶4 In June 2017, the Division of Child and Family Services (DCFS) filed a petition for protective supervision, asserting that Father had physically abused N.H., one of the older sons, and that L.H.—who was then just a few months old—was malnourished and failing to thrive. DCFS's plan, at that point, was to leave the Children in the home and provide supportive services. After adjudicating N.H. abused as to Father and the other Children neglected as to Father, the juvenile court granted DCFS's requested relief and ordered that Father have only supervised contact with the Children. For the time being, the Children remained in the home under Mother's care.

¶5 In August 2017, however, DCFS filed a petition seeking custody of the Children, citing not only the issues raised in its previous petition but also a more recent incident involving Mother and L.H. In response to a report of reckless driving, police found Mother slumped over the steering wheel of her parked car

---

2. In this opinion, for ease of reference, we refer to E.H.'s paternal grandparents as "Grandparents," and we refer to them individually as "Grandmother" and "Grandfather," even though any biological relationship exists only with E.H. and not with the other six Children.

with L.H. in the backseat, and a search of the vehicle turned up several prescription medications in a container not intended for prescriptions, as well as a red straw with "white powder" inside it. Police arrested Mother on suspicion of, among other things, impaired driving; she was later able to provide prescriptions for all the medications found in the car.

¶6     After a hearing, the court granted DCFS's requested relief and placed the Children in the temporary custody of DCFS. The Children were removed from Mother's care later that same day and, when caseworkers went to the home to effectuate the court's order, they observed Mother "wobbling back and forth" and having "a hard time keeping her eyes open." Initially, DCFS caseworkers—with Mother's agreement—arranged a safety plan in which Mother would leave the home and the Children would stay there, in their familiar environment, cared for by Mother's brother. But Mother knowingly failed to follow that plan, and returned to the home without permission two days later. As a result of Mother's actions, DCFS removed the Children from the home and placed them in a group home for children.

¶7     But that placement was temporary, and DCFS eventually needed to move the Children to foster care placements. But because no available foster care placement could accommodate all seven Children, DCFS found it necessary to split the Children up into three different placements. The oldest two were placed in one foster home, the next three in a second, and the Subject Children in a third. Three months later, the oldest two were placed with a paternal aunt. For almost a year, the seven Children were separated into these three groups, and the different groups saw each other only during Parents' supervised parent-time; they were sometimes permitted to call each other, but DCFS did not facilitate any in-person sibling visitation during this period.

¶8     At later hearings, the juvenile court adjudicated the children neglected as to Mother. The court noted L.H.'s "failure to thrive" and the incident involving the parked car, as well as Mother's criminal history—which involved both drug crimes and retail theft—and her "history of mental health issues that [could] place the [C]hildren at risk of harm." Despite these concerns, however, the goal remained reunification and, over the ensuing months, Parents complied with the court's direction well enough that, by July 2018, the family was able to reunify in the home. For the next nine months, the family was together—for the most part[3]—and doing reasonably well, and DCFS anticipated that it might be able to close the case in the spring of 2019. But three events occurred in early 2019 that prompted DCFS to reconsider.

¶9     First, in March 2019, Father injured two of the older Children, and DCFS made a supported finding of physical abuse by Father. In the wake of this incident, and in an effort to avoid a second removal of the Children from the home, Father agreed to move out and to have only supervised visits with the Children. When caseworkers visited the home following Father's departure, they became concerned about Mother's ability to care for the Children on her own; in particular, caseworkers observed several incidents in which Mother left the younger Children unattended.

¶10     Second, in late April 2019, police were called to the home at 1:54 a.m. and found L.H., then just two years old, alone in the family car, which was parked in front of the house. Mother explained that she had been out shopping, gotten home late, and then taken a phone call while L.H. was still out in the car asleep.

---

3. L.H. was removed from the home for a one-month period during this time, again because of concerns that he was malnourished and "failing to thrive."

¶11 Third, in early May 2019, Mother had an encounter with police while in her car at a fast-food restaurant. Officers observed Mother responding quietly and slowly to questions, and they discovered in the car a plastic bag and an unlabeled prescription bottle containing pills later identified as controlled substances. In addition, officers found a razor blade with white residue and a rolled-up dollar bill in the vehicle, evidence that suggested Mother had been misusing the drugs. Mother passed a field sobriety test, and officers later determined that she had valid prescriptions for the pills.

¶12 Following these incidents, DCFS filed a new petition, again seeking to remove the Children from the home and place them in state custody. The juvenile court again adjudicated the Children abused and neglected as to each Parent, and again placed them into the custody of DCFS. The Children were extremely emotional when they learned of the court's order removing them from the home for a second time; in fact, officials even had to use physical force to restrain two of the older sons when the time came to take them into custody. This time, the seven Children were sent to four placements: one of the older sons was placed in a short-term behavioral health facility because of his aggressive behavior during the removal; two of the older sons were placed together; and the two next-oldest sons and the Subject Children were returned to their respective previous foster placements. Just a few weeks later, six of the Children—all but the oldest—were placed together with a single foster family in a different county, but this short reunion lasted only about two months.

¶13 In August 2019, with the school year approaching, Parents requested that the Children be returned to Utah County, a request that again required the Children to be split up. This time, the two oldest were placed together; the next three were placed together in a new placement; and the Subject Children were—for the first time—placed with the family (the Foster Family) who now wishes

to adopt them.[4] The Subject Children bonded very quickly with Foster Family, calling the parents "mom and dad" within just a few weeks of being placed with them. Still, the primary goal remained reunification, and the court ordered additional reunification services. However, DCFS still did not facilitate any sibling visitation, but "left that mostly up to [the] foster parents." Although the foster families initially managed "a few meet-ups on their own," these efforts diminished over time, despite the absence of any indication that the Children—including the Subject Children—did not want to see each other.

¶14 At a court hearing in July 2019, shortly after the second removal, Mother's attorney requested that Grandparents—who were and remain willing to take all seven of the Children—be considered as a possible placement. The court was open to this suggestion but, because Grandparents reside in New Mexico, the court ordered DCFS to "initiate an ICPC[5] as to" Grandparents. But DCFS delayed acting upon the court's order for nearly four

---

4. These arrangements were a bit fluid during this period—at one point, the oldest four Children were combined into one placement, and the fifth-oldest was placed with Foster Family along with the Subject Children. However, the mother of the Foster Family testified at trial that, after a while, the fifth child often got upset at how his younger siblings were becoming so attached to Foster Family, and so she eventually asked that he be placed elsewhere.

5. The abbreviation "ICPC" refers to the Interstate Compact on the Placement of Children, an interstate agreement that has been adopted by all fifty states. *See* Utah Code Ann. § 62A-4a-701 (LexisNexis 2018). The ICPC allows child welfare agencies from different states to more easily cooperate regarding placement of children across state lines.

months, until late October 2019. DCFS attributed the delay, in part, to inadvertence related to a caseworker switch that was occurring right then, but the new caseworker later testified that her "understanding" of the situation was that DCFS "made a decision not to proceed" with the ICPC process "because reunification services were still being offered." Owing at least in part to the four-month delay in getting it started, the ICPC report was still not completed by the beginning of the eventual termination trial in October 2020. On the third day of trial, a DCFS witness explained that New Mexico had just finished its end of the process and had given its "approval" the day before, and that DCFS had filled out its final form the night before.

¶15    The ICPC report, when it was finally completed, raised no concerns with regard to Grandparents, and concluded that their home would be an appropriate placement for the Children. Indeed, one of the DCFS caseworkers testified at trial that she had "no concerns directly about [Grandparents] and their ability to be a safe home." But none of the Children were actually placed with Grandparents until October 2020, due in large part to the delays associated with completion of the ICPC report.

¶16    For several months following the second removal of the Children from the home, the primary permanency goal remained reunification, and DCFS continued to provide reunification services to the family. But in the fall of 2019, after yet another substance use incident involving Mother, DCFS became dissatisfied with Parents' progress and asked the court to change the primary permanency goal. At a hearing held at the end of October 2019, the court agreed, terminated reunification services, and changed the primary permanency goal to adoption with a concurrent goal of permanent custody and guardianship. A few weeks later, the State filed a petition seeking the termination of Parents' rights with regard to all seven Children.

¶17   The court originally scheduled the termination trial to occur at the end of February 2020, but the State requested a continuance because it was working on placing the Children with Grandparents, was waiting for the ICPC report, and wanted "to ensure [that] the Grandparents kn[ew] what they [were] getting into." The court granted the State's requested continuance and rescheduled the trial for the end of March 2020. On March 12—the day before all "non-essential" court hearings in Utah were postponed by administrative order[6] due to the emerging COVID-19 pandemic—all parties filed a stipulated motion asking that the trial be postponed yet again because there was "an ICPC request pending approval" and it was "highly anticipated by all parties that the results of the ICPC [would] resolve all issues pending before the Court." The court granted the stipulated motion and continued the trial, but did so without date because the termination trial was deemed "to be a non-essential hearing." Eventually, after the COVID-related administrative order was amended to allow some non-essential hearings to go forward, the court rescheduled the trial for October 2020, to take place via videoconference.

¶18   In the meantime, despite the fact that the ICPC report was not yet completed, the five oldest Children visited Grandparents in New Mexico for several weeks during the summer of 2020. DCFS did not allow the Subject Children to participate in that visit, not based on any concern about Grandparents' ability to provide appropriate care for them, but because caseworkers

---

6. *See* Administrative Order for Court Operations During Pandemic, Utah Supreme Court (Mar. 13, 2020), https://www.utcourts.gov/alerts/docs/20200311%20-%20Pandem ic%20Administrative%20Order.pdf [https://perma.cc/3EGH-3V3 Z].

believed that such a lengthy visit away from Foster Family would be "scary and upsetting" to the Subject Children.

¶19 During this time, the parties and their attorneys were preparing for trial. From the beginning of the case, Parents had each been provided with a court-appointed lawyer (collectively, Appointed Counsel) to represent them. But toward the end of July 2020, Parents asked a private lawyer (Private Counsel) to represent them at trial.[7] Private Counsel agreed, and Parents paid him a retainer. Parents informed Private Counsel of upcoming pretrial disclosure deadlines, and even gave him a list of fifteen witnesses Parents wanted to call at trial; Private Counsel told them that he would file the appropriate documents and that they did not need to contact their Appointed Counsel. Eventually, Parents discovered that no pretrial disclosures had been made and no motions for extensions of the deadlines had been filed.

¶20 The trial was finally held in October 2020. The first day was spent solely trying to clear up confusion about who was representing Parents. Appointed Counsel appeared for trial, but they indicated that they were unprepared to proceed given the lack of communication from Parents over the weeks leading up to trial. Private Counsel appeared as well, even though he had not filed a notice of appearance, and requested that the trial be continued. The court—not knowing the full picture of what had happened behind the scenes with Parents' attempts to change counsel—chastised Private Counsel for the "very, very late notice and request" and denied the continuance, expressing concern that eleven months had already passed since the trial had originally been set. The court then recessed for the day to allow the parties

---

7. The facts recited in this paragraph regarding Parents' communications with their various attorneys are not in the record, but are included in the materials submitted on appeal in support of Parents' claim of ineffective assistance of counsel.

to confer and negotiate about possible permanency options short of termination of Parents' rights.

¶21   Those negotiations bore fruit, at least in part. With Private Counsel assisting Parents, the parties were able to reach a stipulation that it was in the best interest of the oldest five Children to be placed with Grandparents under an order of permanent custody and guardianship. But the parties were unable to reach a similar stipulation with regard to the Subject Children, and therefore the trial went forward as to them. At that point, Private Counsel withdrew from representing Parents, leaving Appointed Counsel to handle the trial even though they had not—given the lack of communication with Parents—made many of the usual preparations for a trial.

¶22   In support of its case, the State presented testimony from four DCFS caseworkers, two therapists, Mother's former and current probation officers, and the mother from the Foster Family (Foster Mother). Foster Mother testified that the Subject Children had developed a strong bond with Foster Family and "love[d] spending time with [them]." She also stated that the Subject Children refer to her three children as "their brother and sisters," that "[n]obody is ever left out amongst the kids," and that L.H. "believes he is part of [their] family" and "has said, on multiple occasions, that he's already adopted." The two therapists testified that the Subject Children did indeed have a strong bond with Foster Family; one of them stated that it was "the most secure attachment [she had] ever witnessed . . . between a foster parent and a foster child," and offered her view that it would be "hugely devastating" for them if they were removed from Foster Family.

¶23   Several of the caseworkers testified about the strength of the bond between the Subject Children and their older siblings, and they painted a picture in which those bonds were originally very strong but had begun to weaken over time as the Subject

Children spent less time with their siblings and became more attached to Foster Family. One of the first caseworkers to work with the family testified that the bonds had been strong among all the Children, including the Subject Children. Another testified about how emotional the older children were upon learning that they were to be removed from the home a second time and again separated from most of their siblings. But another caseworker—who had been assigned to the family in 2019—testified that the Subject Children's bond to their older siblings was weakening as they became more attached to Foster Family. In general, the caseworkers voiced concerns about separating siblings, offering their view that ordinarily "children should stay together" and that placing siblings together "is understood under most circumstances . . . to be beneficial to the kids."

¶24    Parents were prohibited from introducing many of their witnesses because they had failed to make their required pretrial disclosures. In particular, Parents were prepared to call one of the Subject Children's former foster parents as well as some of the older Children, who would each have apparently testified that the bonds between the Subject Children and their siblings had been, and still remained, very strong. But the court refused to allow Parents to call these witnesses because they had not been timely disclosed. The court did, however, allow Parents to offer testimony of their own, and to call Grandparents to testify.

¶25    For their part, Parents testified about how closely bonded the Children had been before DCFS became involved. Father testified that the older siblings had expressed a desire to all be together and noted that, if they were placed with Grandparents, the Subject Children would not only be with siblings, but also with cousins, and would have a large network of familial support. Mother testified that she, too, wanted the Children to be kept together and stated that she knew she was "not what [the Children] deserve" "right now," but offered her view that, at

some point in the future, after she has "[gotten] [her]self together," she "will be what's best for them."

¶26 Grandfather testified that he and Grandmother told DCFS, right from the start, that they were willing to take all seven children. He explained that they were accustomed to large families, having raised eight children of their own; he noted that two of those children lived nearby, meaning that the Children, if they lived with him, would have aunts, uncles, and cousins in the vicinity. Grandfather testified that he and Grandmother had renovated their house to accommodate all seven children and that they were able, financially and otherwise, to take on the responsibility. He acknowledged that raising seven children was not how he had originally envisioned spending his retirement years, but he offered his view that "no matter what else I could be doing in the next ten or twenty years," what mattered most to him was "that [he] could be doing something to make a difference in the lives of these kids." Grandmother testified that she had bonded with A.H. during her three-week stay with the family after L.H. was born, and she offered her view that it had been difficult to get Foster Mother to facilitate telephonic or virtual visits between the older siblings and the Subject Children during the older siblings' summer 2020 visit to New Mexico.

¶27 After trial, the court took the matter under advisement for six months, issuing a written decision in May 2021. In that ruling, the court terminated Parents' rights as to A.H. and L.H. It found sufficient statutory grounds for termination of Parents' parental rights, including Father's physical abuse of some of the older sons, Parents' neglect of L.H. when he was malnourished and failing to thrive as an infant, and neglect of the Children for failing to protect them from Mother's substance use. Similarly, the court found that Mother had neglected the Children by failing to properly feed L.H., insufficiently supervising the Subject Children, and improperly using drugs. Moreover, the court found

that Mother's "substance abuse and criminal behavior" rendered her unfit as a parent.

¶28 The court next found that DCFS had made "reasonable efforts towards the permanency goal of reunification." It noted that DCFS has been involved with the family since April 2017 and, "during the arc of the case, circumstances changed frequently and there were many setbacks in the attempts to reunify the children with the parents." The court concluded that "reunification efforts were not successful through no fault of DCFS."

¶29 Finally, as to best interest, the court determined—in keeping with the parties' stipulation—that, with regard to the oldest five siblings, "a permanent custody and guardianship arrangement" with Grandparents "would serve their best interests as well as, or better than, an adoption would." But the court saw it differently when it came to the Subject Children, concluding that their best interest would be best served by the facilitation of an adoption by Foster Family, and that termination of Parents' rights was strictly necessary to advance that interest. The court reached that decision even though it meant permanently separating the Children, and even though the court acknowledged that Grandparents were "certainly appropriate caregivers." The court offered several reasons for its decision. First, it noted that the Subject Children were very young—A.H. was two-and-a-half years old, and L.H. was eight months old, when they were first removed from the family home—and that, as a result, they "had a very short time to be with their older siblings." Second, the court concluded that the strength of the bond between the Subject Children and their siblings was not particularly strong, opining that the Subject Children "have little beyond a biological connection" to their siblings. In this vein, the court downplayed any positive effects that might come from keeping the Children together, describing the older siblings as "a large and unruly group" that "cannot be depended upon to

protect" the Subject Children. Third, the court discussed the unquestionably strong bond that the Subject Children had formed with Foster Family. Fourth, the court concluded that disruption of the Subject Children's "placement at this time would be very detrimental" and would "put them at unnecessary risk for future emotional and mental health issues." Fifth, the court expressed concern that, absent termination, Parents would retain some level of parental rights and might attempt "to regain custody of the [C]hildren in the future," an eventuality the court believed would "pose a risk to" the Subject Children. And finally, the court emphasized the importance of stability, stating that "the [Subject Children] and [Foster Family] deserve, and indeed need, the highest level of legal protection available, which would be achieved through adoption." For these reasons, the juvenile court terminated Parents' rights with regard to the Subject Children.

ISSUE AND STANDARD OF REVIEW

¶30    Parents now appeal the juvenile court's order terminating their parental rights, but their appeal is narrowly focused. Parents do not challenge the juvenile court's determination that statutory grounds exist for terminating their parental rights. However, Parents do challenge the court's determination that termination of their parental rights was strictly necessary and in the best interest of the Subject Children. We review a lower court's "best interest" determination deferentially, and we will overturn it "only if it either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *In re E.R.*, 2021 UT 36, ¶¶ 22, 31, 496 P.3d 58 (quotation simplified). But "such deference is not absolute." *Id.* ¶ 32. We do not afford "a high degree of deference" to such determinations; rather, we simply apply "the same level of deference given to all lower court findings of fact and 'fact-like' determinations of mixed questions." *Id.* ¶¶ 29–30. In addition, our deference must

be guided by the relevant evidentiary standard applicable in termination of parental rights cases: the "clear and convincing" evidence standard. *See In re G.D.*, 2021 UT 19, ¶ 73, 491 P.3d 867. "Although we defer to juvenile courts' [best-interest] determinations, in reviewing their conclusions we do so with an exacting focus on the proper evidentiary standard," and "we will not only consider whether any relevant facts have been left out but assess whether the juvenile court's determination that the 'clear and convincing' standard had been met goes against the clear weight of the evidence." *Id.*[8]

## ANALYSIS

¶31 The right of parents to raise their children is one of the most important rights any person enjoys, and that right is among the fundamental rights clearly protected by our federal and state constitutions. *See Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (stating that "the interest of parents in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests" the court recognizes); *see also In re J.P.*, 648 P.2d 1364, 1372 (Utah 1982) ("A parent has a fundamental right, protected by the Constitution, to sustain his relationship with his child." (quotation simplified)). Our legislature has expressed similar sentiments, declaring that "[u]nder both the United States Constitution and the constitution of this state, a

---

8. Parents also raise other issues, including an assertion that Private Counsel rendered deficient performance that prejudiced them at the termination trial. Although we acknowledge the strength of Parents' assertion that Private Counsel rendered ineffective assistance, and discuss in passing the problems they had with him, we need not reach the merits of that claim or any of their other claims because we reverse on the merits of their main claim.

parent possesses a fundamental liberty interest in the care, custody, and management of the parent's child," *see* Utah Code Ann. § 80-4-104(1) (LexisNexis Supp. 2022), and that this interest "does not cease to exist simply because . . . a parent may fail to be a model parent," *id.* § 80-4-104(4)(a)(i).

¶32    The "termination" of these fundamental "family ties . . . may only be done for compelling reasons." *See id.* § 80-4-104(1). Under our law, a parent's rights are subject to termination only if both parts of a two-part test are satisfied. First, a court must find that one or more statutory grounds for termination are present; these include such things as abandonment, abuse, or neglect. *See id.* § 80-4-301(1). Second, a court must find that termination of the parent's rights is in the best interest of the children. *See In re B.T.B.*, 2020 UT 60, ¶¶ 19–20, 472 P.3d 827. The party seeking termination of a parent's rights bears the burden of proof on both parts of this test. *See In re G.D.*, 2021 UT 19, ¶ 43, 491 P.3d 867 (stating that "petitioners in termination proceedings must prove termination is warranted"). And that party must make this required showing "by clear and convincing evidence." *Id.*; *see also Santosky v. Kramer*, 455 U.S. 745, 769–70 (1982) (concluding that the U.S. Constitution requires application of a "clear and convincing evidence" standard in parental termination proceedings).

¶33    As noted, Parents do not challenge the juvenile court's determination that statutory grounds for termination exist in this case. Their challenge is limited to the second part of the test: whether termination of their rights is, under the circumstances presented here, in the best interest of the Subject Children.

¶34    "The best interest of the child has always been a paramount or 'polar star' principle in cases involving termination of parental rights," although it is not "the sole criterion." *In re J.P.*, 648 P.2d at 1368. The assessment of what is in a child's best interest is, by definition, "a wide-ranging inquiry that asks a court to weigh the

entirety of the circumstances" surrounding a child's situation, including "the physical, intellectual, social, moral, and educational training and general welfare and happiness of the child." *See In re J.M.*, 2020 UT App 52, ¶¶ 35, 37, 463 P.3d 66 (quotation simplified). Because children inhabit dynamic environments in which their "needs and circumstances" are "constantly evolving," "the best-interest inquiry is to be undertaken in a present-tense fashion," as of the date of the trial or hearing held to decide the question. *See In re Z.C.W.*, 2021 UT App 98, ¶¶ 12–13, 500 P.3d 94 (quotation simplified).

¶35 Our legislature has provided two related pieces of important guidance on the best-interest question. First, it has expressed a strong preference for families to remain together, establishing something akin to a presumption that a child's best interest will "usually" be served by remaining with the child's parents:

> It is in the best interest and welfare of a child to be raised under the care and supervision of the child's natural parents. A child's need for a normal family life in a permanent home, and for positive, nurturing family relationships is usually best met by the child's natural parents.

Utah Code Ann. § 80-4-104(8). In that same statutory section, our legislature also emphasized that, "[w]herever possible, family life should be strengthened and preserved." *See id.* § 80-4-104(12). And the "family" includes the child's parents as well as the child's siblings; indeed, in the related child custody context, our legislature has specifically identified "the relative benefit of keeping siblings together" as a factor that the court "may

consider" when evaluating "the best interest of the child." *See id.* § 30-3-10(2)(o) (LexisNexis 2019).[9]

¶36    Second, our legislature has mandated that termination of parental rights is permissible only when such termination is "strictly necessary." *See id.* § 80-4-301(1). Our supreme court has interpreted this statutory requirement to mean that "termination must be strictly necessary to promote the child's best interest." *See In re B.T.B.*, 2020 UT 60, ¶ 60. Indeed, a court's inquiry into the strict necessity of termination should take place as part of the best-interest inquiry that comprises the second part of the termination test. *See id.* ¶ 76 (stating that, "as part of [the best-interest inquiry], a court must specifically address whether termination is strictly necessary to promote the child's welfare and best interest").

¶37    In assessing whether termination is strictly necessary to promote a child's best interest, courts "shall consider" whether "sufficient efforts were dedicated to reunification" of the family, and whether "the efforts to place the child with kin who have, or are willing to come forward to care for the child, were given due weight." *See* Utah Code Ann. § 80-4-104(12)(b). Indeed,

---

9. A court's consideration of the importance of sibling relationships is arguably even more important in the termination/adoption context than it is in the child custody context, simply because of the permanency of termination and adoption. When split custody is ordered in a domestic case, the children will not live together all the time, but their overarching family relationship remains intact; they will remain siblings and, depending on visitation schedules, they will likely see each other several times each month. But when—as in this case—siblings are separated for purposes of adoption, the familial bonds, including the sibling bonds, are more permanently affected.

> this part of the inquiry also requires courts to explore whether other feasible options exist that could address the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating the parent's rights. In some cases, alternatives will be few and unsatisfactory, and termination of the parent's rights will be the option that is in the child's best interest. But in other cases, courts should consider whether other less-permanent arrangements might serve the child's needs just as well.

*In re B.T.B.*, 2020 UT 60, ¶ 67 (quotation simplified). Courts that order termination of parental rights without appropriately exploring "feasible alternatives to termination" have not properly applied the second part of the two-part termination test. *See, e.g.,* *In re H.F.*, 2019 UT App 204, ¶ 17, 455 P.3d 1098 (reversing and remanding a juvenile court's termination order because, among other things, "the court's determination that termination was strictly necessary was not supported by an appropriate exploration of feasible alternatives to termination").

¶38 In this case, Parents challenge the juvenile court's best-interest determination, including its subsidiary conclusion that termination of their rights was strictly necessary to promote the best interest of the Subject Children. As discussed herein, we find merit in Parents' challenge. We recognize that we are reviewing the juvenile court's determinations deferentially, and we do not lightly reverse a court's best-interest determination. But the facts of this case simply do not amount to strict necessity, and therefore the best-interest requirement is not met. Stated another way, the evidence presented at trial did not constitute clear and convincing evidence that termination of Parents' rights to the Subject Children would be in the best interest of those children. Under the specific circumstances of this case, the juvenile court's

determination was against the clear weight of the evidence, and on that basis we reverse.

¶39 In its written decision, the juvenile court set forth several reasons for its conclusion that termination of Parents' rights was strictly necessary to promote the Subject Children's best interest.[10] We discuss those reasons, in turn. Although the topics that the juvenile court focused on are certainly appropriate topics to consider when examining best interest, we conclude that the facts underlying those topics—in this case—do not support a determination that termination was strictly necessary to promote the best interest of the Subject Children.

¶40 The court began its best-interest examination by discussing the ages of the Subject Children and, relatedly, the fact that the bonds between the Subject Children and their siblings had deteriorated. The Subject Children are, as noted, the youngest of the seven Children and were very young—A.H. was two-and-a-half years old, and L.H. was eight months old—when they were first removed from the family home. The juvenile court noted that, as a result, they "did not have the opportunity to live with their parents for as long as their older siblings" and "had a very short time to be with their older siblings." These facts are

---

10. Parents assert that the juvenile court erred by limiting its best-interest inquiry to the Subject Children, rather than considering whether termination of Parents' rights to the Subject Children was in the best interest of all the Children. Although we are far from persuaded by Parents' assertion, we need not further concern ourselves with it, because for purposes of our analysis we assume, without deciding, that the juvenile court properly focused on the Subject Children when conducting the best-interest inquiry. Even assuming the propriety of that more limited focus, we nevertheless find the court's ultimate best-interest determination unsupported by clear and convincing evidence.

unquestionably true, and one of the consequences of these facts is that the Subject Children had less-developed bonds with Parents and with their siblings than the other Children did. But this will almost always be true when children are removed from their homes as newborns or toddlers, and courts must be careful not to overemphasize the significance of the deterioration of familial bonds—particularly sibling bonds—when that deterioration is the result of court-ordered removal from the home at an early age. *See, e.g.*, *In re N.M.*, 186 A.3d 998, 1014 n.30 (Pa. Super. Ct. 2018) (vacating an order terminating parental rights in part because the lower court's decisions during the case had been "designed to affect the bond between" the parents and the child "so that termination would be the natural outcome of the proceedings").

¶41 The facts of this case present an interesting case study. The next-oldest of the Children was born in April 2013, and is less than two years older than A.H. He was only four years old at the time of the first removal, and yet the juvenile court determined that it would *not* be in his best interest for Parents' rights to be terminated. Many of the differences—especially in terms of the strength of the sibling bonds—between the Subject Children's situation and that of their barely-older brother are largely the result of decisions made by DCFS and the court during the pendency of these proceedings. In a situation like this, a court must be careful not to ascribe too much weight to circumstances that are of the court's own making.

¶42 We do not doubt the juvenile court's finding that, by the time of trial, the bonds between the Subject Children and the other Children were not as strong as the bonds between the five oldest Children. We take at face value the court's statement that the Subject Children, at the time of trial, had "little beyond a biological connection" to their older siblings. But even the biological connection between siblings matters. The connection between siblings is, for many people, the longest-lasting

connection they will have in life. Indeed, "the importance of sibling relationships is well recognized by . . . courts and social science scholars," because "a sibling relationship can be an independent emotionally supporting factor for children in ways quite distinctive from other relationships, and there are benefits and experiences that a child reaps from a relationship with his or her brother(s) or sister(s) which truly cannot be derived from any other." *In re D.C.*, 4 A.3d 1004, 1012 (N.J. 2010) (quotation simplified); *see also* Aaron Edward Brown, *He Ain't Heavy, He's My Brother: The Need for a Statutory Enabling of Sibling Visitation*, 27 B.U. Pub. Int. L.J. 1, 5 (2018) (noting that "[t]oday's children are more likely to grow up with a sibling than a father," and that "[t]he sibling relationship is generally regarded to be the longest relationship a person will have because the relationship will typically last longer than a relationship with a parent or spouse"). Such bonds are often especially important "to children who experience chaotic circumstances" like abuse or neglect, because "in such circumstances, they learn very early to depend on and cooperate with each other to cope with their common problems." *In re D.C.*, 4 A.3d at 1013 (quotation simplified); *see also In re Welfare of Child of G.R.*, No. A17-0995, 2017 WL 5661606, at *5 (Minn. Ct. App. Nov. 27, 2017) ("The sibling relationship is especially important for a young child with an unstable family structure as these siblings can provide secure emotional attachment, nurturing, and solace."). Indeed, trial testimony from the DCFS caseworkers mirrored these sentiments, with the caseworkers stating that "children should stay together" and that placing siblings together "is understood under most circumstances . . . to be beneficial to the kids."

¶43    And there is nothing in the record before us that indicates significant trouble among the sibling ranks. To the contrary, by all accounts the Children are quite loyal to one another, as best exemplified by their collective reaction—outrage—to being

removed from the family home, and from each other, a second time in 2019. The juvenile court referred to them as a "large and unruly group," but that description would seem to fit almost any group of seven siblings. The court also appeared concerned about "significant sibling rivalr[ies]" among some of the older Children but, again, we would be surprised to find a seven-member sibling group that *didn't* have significant sibling rivalries. The court also offered its view that "[t]he older boys cannot be depended upon to protect" the Subject Children, but we think that's an unfair expectation, as the court itself noted. And there are no allegations (for example, of intra-sibling abuse) about or among this sibling group that would counsel against keeping the group together.

¶44 We are also troubled, under the unusual circumstances of this case, by the fact that the deterioration of the Subject Children's bonds with their siblings was due, in not-insignificant part, to the way this case was litigated, even apart from the removal and placement decisions. Notably, DCFS did not take any systematic steps to facilitate visitation between the three (and sometimes four) sibling groups that were placed in different homes, but instead "left that mostly up to [the] foster parents."[11] In particular, DCFS did not allow the Subject Children to visit Grandparents with the rest of the Children during the summer of 2020. And Grandmother offered her perception that it had been difficult to get Foster Mother to facilitate telephonic or virtual

---

11. DCFS's actions in this regard were arguably contrary to statute. *See* Utah Code Ann. § 62A-4a-205(12)(a) (LexisNexis Supp. 2022) (stating that DCFS must "incorporate reasonable efforts to . . . provide sibling visitation when siblings are separated due to foster care or adoptive placement"); *see also id.* § 80-3-307(12)(a) (requiring DCFS to "incorporate into the child and family plan reasonable efforts to provide sibling visitation if . . . siblings are separated due to foster care or adoptive placement").

visits between the older siblings and the Subject Children during the older siblings' summer 2020 visit. Under these circumstances, it is no wonder that the Subject Children's bond with their siblings began to wane. It is intuitive that relationships can become more distant without meaningful contact. To at least some degree, the deterioration of the sibling bonds is attributable to DCFS's (and the various foster parents') actions in failing to facilitate regular sibling visitation.

¶45    In addition, DCFS's delay in starting the ICPC process appears to have also played a role in the way this case turned out. In July 2019, the juvenile court ordered that "an ICPC" be conducted to explore the possibility of placing the Children with Grandparents in New Mexico. But DCFS—perhaps intentionally, according to one of the caseworkers—delayed acting upon the court's ICPC order for nearly four months, until late October 2019. Delays in obtaining ICPC reports are not necessarily uncommon, and can be just an unfortunate part of the process of communicating between agencies of different states. But such delays are troubling when they are attributable to a state agency's refusal to even get the process started, despite a court order requiring it to do so. Although DCFS could not have known it at the time, its failure to timely initiate the ICPC process may have mattered more in this case than in others, because of the eventual emergence, in early 2020, of the COVID-19 pandemic.

¶46    Recall that, in the fall of 2019 and early 2020, after DCFS filed its termination petition, all parties were on the same page: they were working toward placing the Children—all of them— with Grandparents in New Mexico. Indeed, it was "highly anticipated by all parties that the results of the ICPC [would] resolve all issues pending before the Court." But before a placement with Grandparents could happen, the ICPC report needed to be completed, and the parties twice stipulated to continuances of the termination trial specifically so that the ICPC

report could be finished, and so that they could "ensure [that] the Grandparents kn[ew] what they [were] getting into." These continuances resulted in the trial being rescheduled for late March 2020, which in turn resulted in the trial being postponed again because of the emergence of the pandemic. The ICPC report was not completed until October 2020, and by then, the Subject Children had been with Foster Family for more than a year and had begun to develop meaningful bonds there. Under these circumstances, it is hard not to wonder what might have happened if DCFS had begun the ICPC process in July 2019, as it had been ordered to do.[12]

---

12. The juvenile court addressed this issue in its written ruling, and downplayed the significance of the delayed ICPC report. It expressed its view that, even if DCFS had timely requested the ICPC report, the case would not have come out differently. First, it assumed that the ICPC process would have taken a year to complete even if the report had been requested in July 2019. We wonder about that, and in particular wonder whether any of the delays in completing the ICPC report were due to the emergence of the pandemic. But more to the point, the court indicated that it would have made the same termination decision in July 2020 as it made in October 2020. However, the court does not account for the fact that all parties to the case, including DCFS, were on the same page at least as late as March 12, 2020, and anticipated placing all the Children with Grandparents as soon as the ICPC report came back. Had the ICPC report come back significantly earlier, while the parties were still in agreement, things almost certainly would have been different. We doubt that the juvenile court would have rejected the parties' stipulation on that point, just as it did not reject the parties' October 2020 stipulation regarding the five oldest Children.

¶47    Next, the court—appropriately—discussed at some length the Subject Children's bond with Foster Family. There is no doubt that Foster Family is an appropriate adoptive placement, and that Foster Parents are doing a wonderful job caring for the Subject Children. The court made unchallenged findings in this regard, noting that Foster Parents are the ones "who care for them on a daily basis, feed them, hug them, and put them to bed," and that, from the Subject Children's point of view, Foster Parents "are their parents." We do not minimize the significance of these findings. They are important, and are a necessary condition to any adoption-related termination of parental rights. After all, if an adoptive placement is not working out, an adoption into that placement is very unlikely to be finalized.

¶48    But while the existence of an acceptable adoptive placement is a necessary condition to any adoption-related termination, it is not a sufficient one. At some level, we certainly understand the impulse to want to leave children in—and perhaps make permanent—a putative adoptive placement in which the children are thriving. And we recognize—as the juvenile court observed here—that taking a child out of a loving adoptive placement in order to reunite the child with family can be detrimental to the child, at least in the short term. But in order to terminate parental rights to facilitate an adoption, a court must have before it more than just a loving and functional adoptive placement from which it would be emotionally difficult to remove the child. Termination of parental rights must be "strictly necessary to promote the . . . welfare and best interest" of the children in question. *See In re B.T.B.*, 2020 UT 60, ¶ 76, 472 P.3d 827. And in order to reach that conclusion, a court must do more than make a finding about the acceptability of the adoptive placement—it must examine potential options, short of termination, that might also further the best interest of the children in question. *Id.* ¶¶ 66–67. In particular, and especially in

light of our legislature's guidance that families should be kept together whenever possible, *see* Utah Code Ann. § 80-4-104(8), (12), courts must investigate kinship placement possibilities, including options for permanent guardianship. And if one of those placements turns out to be an option that can promote the child's best interest "just as well," then it is by definition not "strictly necessary" to terminate the parent's rights. *See In re B.T.B.*, 2020 UT 60, ¶¶ 66–67.

¶49 Moreover, in this context courts must keep in mind the "clear and convincing" evidentiary standard. *See In re G.D.*, 2021 UT 19, ¶ 44, 491 P.3d 867. If there exists a completely appropriate kinship placement through which the family can remain intact, the "strictly necessary" showing becomes significantly more difficult to make. We stop well short of holding that, where an acceptable kinship placement exists, it can never be strictly necessary to terminate a parent's rights. But in such cases, the proponent of termination must show, by clear and convincing evidence, that the adoptive placement is materially better for the children than the kinship placement is. After all, if the two placements can each "equally protect[] and benefit[]" the child's best interest, then by definition there does not exist clear and convincing evidence in favor of terminating a parent's rights. *See In re B.T.B.*, 2020 UT 60, ¶ 66. And in this case, the necessary showing was not made.

¶50 Perhaps most significantly, there is not a hint of any evidence in the record before us that placement with Grandparents is flawed. The ICPC report (finally) came back clean; that report raised no concerns with regard to Grandparents, and concluded that their home would be an appropriate placement for the Children. The five older siblings had a lengthy visit with Grandparents in the summer of 2020, and all went well. And just before trial, the parties stipulated that the five oldest Children should be placed with Grandparents on a long-term

basis, subject to a permanent custody and guardianship arrangement. The court approved this stipulation, agreeing with the parties "that a permanent custody and guardianship arrangement" would serve the best interest of the five oldest Children. It even found that Grandparents are "certainly appropriate caregivers." And on appeal, all parties agree that Grandparents are acceptable and loving caregivers; no party has even attempted to take issue with Grandparents' ability to provide a loving and stable home for the Children. There is no dispute that Grandparents have the capacity and ability, from a financial standpoint as well as otherwise, to care for all seven Children, and stand ready and willing to do so, regardless of whether that takes the form of an adoption or a permanent guardianship arrangement.

¶51    The juvenile court opted to go in a different direction, primarily for three related reasons. First, it emphasized how "detrimental" and "destabilizing" it would be for the Subject Children to be removed from Foster Family. Second, the court emphasized that the Subject Children need stability and permanency, and determined that adoption—as opposed to guardianship—could best provide that stability. Third, the court expressed concern that, absent an adoption, Parents might attempt—at some later point in time—to get back into the lives of the Subject Children, and perhaps even "regain custody," an eventuality the court believed would "pose a risk to" the Subject Children. In our view, these stated reasons do not constitute clear and convincing reasons to terminate Parents' rights.

¶52    With regard to permanency and stability, our supreme court has recently clarified that the mere fact that adoptions—as a category—provide more permanency and stability than guardianships do is not enough to satisfy the statutory "strictly necessary" standard. *See In re J.A.L.*, 2022 UT 12, ¶ 24, 506 P.3d 606. In that case, the court held that the lower court

fell into legal error in concluding that [a guardianship option] would not provide the "same degree of permanency as an adoption." That is not the question under our law. A permanent guardianship by definition does not offer the same degree of permanency as an adoption. And there is always some risk that the permanent guardianship could come to an end, or be affected by visitation by the parent. If these categorical concerns were enough, termination and adoption would be strictly necessary across the board. But such categorical analysis is not in line with the statutory standard.

*Id.* The court then noted that, as part of the "strictly necessary" analysis, a court "must assess whether a permanent guardianship can equally protect and benefit the children in the case before it." *Id.* ¶ 25 (quotation simplified). The court made clear that the statutory requirements were "not met by the categorical concern that a permanent guardianship is not as stable or permanent as an adoption," and instead "require[] analysis of the particularized circumstances of the case before the court." *Id.*

¶53 As applied here, this recent guidance renders insufficient—and more or less beside the point—the juvenile court's apparent belief that an adoption was better than a guardianship simply because it was more permanent and more stable. All adoptions are at least somewhat more permanent than guardianships, and therefore that conclusion, standing alone, is not enough to constitute clear and convincing evidence supporting termination. It is certainly appropriate for courts in termination cases to discuss the potential need for permanency and stability. But in doing so, and when selecting an adoptive option over a guardianship option, a court in a termination case must articulate case-specific reasons why the added layer of permanency that adoptions offer is important and why adoption

would better serve the best interest of the children in question than the guardianship option would.

¶54 The court's concern about the possibility of Parents re-entering the Children's lives is, on this record, not an adequate case-specific reason. As an initial matter, it—like the lack of permanency—is a feature of the entire *category* of guardianships. It will always be true that, in a guardianship, a parent retains what the juvenile court here referred to as "residual rights," while in an adoption the parent's rights are terminated forever. This kind of categorical concern is not enough to constitute clear and convincing evidence in support of termination.

¶55 Moreover, we question whether—in many cases, including this one—a parent's desire to re-engage in their child's life should be viewed as negatively as the juvenile court appeared to view it. Here, we return to the statutory guidance offered by our legislature: that "family life should be strengthened and preserved" "[w]herever possible," and that it is usually "in the best interest and welfare of a child to be raised under the care and supervision of the child's natural parents." *See* Utah Code Ann. § 80-4-104(8), (12). We note our own observation that, "[i]n many cases, children will benefit from having more people—rather than fewer—in their lives who love them and care about them." *See In re B.T.B.*, 2018 UT App 157, ¶ 55, 436 P.3d 206, *aff'd*, 2020 UT 60, 472 P.3d 827. And we acknowledge Parents' point that a parent whose child has been placed in a permanent guardianship arrangement in a child welfare proceeding has no independent right to petition to change or dissolve the guardianship. *See* Utah Code Ann. § 78A-6-357(3)(d) (LexisNexis Supp. 2022). Only the guardian has that right. *See id.* And there is no evidence, in this record, that Grandparents will be particularly susceptible to inappropriate pressure from Parents to seek a change in the terms of any guardianship arrangement. In addition, there is no evidence that, if the Subject Children were placed into a

guardianship with Grandparents, it would be harmful to them for Parents to retain the possibility of maintaining some form of contact with them (as they have with regard to the other Children), as supervised by court order and by Grandparents acting as guardians.[13] In other words, the juvenile court did not emphasize any case-specific issues that make us especially concerned about the possibility of Parents attempting to re-enter the Children's lives at some point in the future.

¶56 We are thus left with the court's concern—shared by the Subject Children's therapists—about the disruption in the Subject Children's lives that would be caused by removing them from Foster Family and placing them with Grandparents, alongside their siblings. This is of course a legitimate concern, and one that courts should take into account in situations like this. If and when the Subject Children are ever placed into a guardianship with Grandparents, and taken from Foster Family, that will no doubt be traumatic for them, at least in the short term. We acknowledge the validity of such concerns, and do not intend to minimize them. But in this case, focusing too much on this more-present

---

13. Indeed, concerns about Parents potentially getting back into the lives of the Subject Children appear especially overblown under the facts of this case, given the fact that the juvenile court approved the stipulation for a permanent guardianship arrangement for the other five Children. The court does not convincingly explain why it is concerned for the Subject Children and not the others, stating only that the potential for the Parents to "regain custody . . . might not be devastating for the older children, but it will certainly be devastating to" the Subject Children. Presumably, this is a reference to the fact that the Subject Children are younger and have less of a pre-existing relationship with Parents and the other Children, an aspect of this case that we have already discussed.

possibility of emotional trauma risks minimizing the longer-term emotional trauma that permanent severance of the sibling bonds will likely someday trigger. In this specific and unique situation, the juvenile court's discussion of potential emotional trauma associated with removal from Foster Family does not constitute clear and convincing evidence supporting termination.

¶57 For all of these reasons, we conclude that the juvenile court's best-interest determination was against the clear weight of the evidence presented at trial. The State failed to prove, by clear and convincing evidence, that termination of Parents' rights to Subject Children was strictly necessary, especially given the presence of another available and acceptable option—permanent guardianship with Grandparents, alongside their five siblings— that would not require permanent severance of familial bonds and that would serve the Subject Children's best interest at least as well as adoption. *See In re G.D.*, 2021 UT 19, ¶ 75 ("[W]hen two placement options would equally benefit a child, the strictly-necessary requirement operates as a preference for a placement option that does not necessitate termination over an option that does."). Under the unique circumstances of this case, termination of Parents' rights is not strictly necessary to promote the Subject Children's best interest.

CONCLUSION

¶58 Accordingly, we reverse the juvenile court's order of termination, and remand the case for further proceedings consistent with this opinion. We offer a reminder that best-interest determinations are to be conducted in present-tense fashion, as of the date of the trial or hearing convened to consider the matter. *See In re Z.C.W.*, 2021 UT App 98, ¶ 14, 500 P.3d 94. Our holding today is that, based on the evidence presented at trial in October 2020, termination of Parents' rights was not strictly necessary to

promote the Subject Children's best interest. On remand, the juvenile court should re-assess best interest. If nothing has materially changed since October 2020, then we expect the court to enter orders designed to work (perhaps quite gradually, in the court's discretion) toward integration of the Subject Children into a placement with Grandparents, alongside their siblings. But if there is evidence that matters have materially changed since October 2020, the court may need to consider that evidence in some fashion, *see id.* ¶ 15, and re-assess best interest based on the situation at the time of the hearing.

———————