2026 UT App 88

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF
A.H., J.H., J.H., L.H., N.H., S.H., AND E.H.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

N.H.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20210353-CA
Filed June 4, 2026

Fourth District Juvenile Court, Provo Department
The Honorable Suchada P. Bazzelle
The Honorable Elizabeth Lindsley
No. 1145453

Alexandra Mareschal, Kirstin H. Norman,
Jason B. Richards, and Debra M. Nelson,
Attorneys for Appellant

Derek E. Brown, Deborah A. Wood, and
John M. Peterson, Attorneys for Appellee

Martha Pierce, Alisha Giles, and Heath Haacke,
Guardians ad Litem

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1 This termination-of-parental-rights case comes before us for a second time. In our first opinion, we reversed the juvenile court's determination to terminate the parental rights of S.H.

(Mother) and N.H. (Father) (collectively, Parents) regarding their two youngest children, Alice and Liam.[1] *See In re A.H.*, 2022 UT App 114, 518 P.3d 993, *rev'd*, 2024 UT 26, 554 P.3d 969. In particular, we concluded that, "based on the evidence presented at trial in October 2020, termination of Parents' rights was not strictly necessary to promote [Alice's and Liam's] best interest." *Id.* ¶ 58. In light of that conclusion, we had no occasion to reach the other two issues Parents had raised in their original appeal: (a) that they had received ineffective assistance of counsel and (b) that the Utah Division of Child and Family Services (DCFS) had failed to exercise reasonable efforts to keep the family together.

¶2     Later, the Utah Supreme Court agreed to review our decision, but it limited its review solely to the best-interest determination. That court reversed our decision, concluding that the juvenile court, in its original decision, had appropriately determined, based on the evidence presented to it, "that severing the legal connection with Alice and Liam's biological parents was strictly necessary to serve their best interest." *In re A.H.*, 2024 UT 26, ¶ 73, 554 P.3d 969. The supreme court then sent the case back to this court "for consideration of the remaining issues in [Parents'] initial appeal." *Id.* ¶ 5.

¶3     Within days of receiving the case back from the supreme court, we issued an order granting Parents' motion—filed in connection with their initial appeal—for a remand to the juvenile court for supplementation of the record regarding Parents' claims of ineffective assistance. The juvenile court held a four-day evidentiary hearing, at which thirteen witnesses—most of whom had not testified at the original trial—provided testimony. A few weeks later, the juvenile court issued comprehensive and

---

1. The names we use to refer to the two youngest children are pseudonyms. For consistency, we use the same pseudonyms our supreme court used in its opinion in this case. *See In re A.H.*, 2024 UT 26, ¶ 2, 554 P.3d 969.

thorough findings of fact, and we then asked the parties for supplemental briefing.

¶4     Now, with a more complete record before us, we address Father's continuing assertion that Parents received ineffective assistance of counsel during the October 2020 trial.[2] For the reasons discussed, we conclude that all three attorneys involved in the case on Parents' side rendered deficient performance, and we additionally conclude that the attorneys' deficient performance prejudiced Father. On this basis, we once again vacate the juvenile court's order terminating Father's rights regarding Alice and Liam, and we once again remand this matter to the juvenile court, this time for a new trial.

BACKGROUND

¶5     Because this is the third appellate opinion in this case, and because the events leading to the initiation of these proceedings have already been thoroughly described in the first two opinions, *see In re A.H.*, 2024 UT 26, ¶¶ 6–28; *In re A.H.*, 2022 UT App 114, ¶¶ 2–29, we limit our discussion of the original background facts to those "necessary to resolve the issues" remaining in this appeal, *In re R.D.*, 2024 UT App 91, n.1, 554 P.3d 318 (cleaned up), *cert. denied*, 558 P.3d 90 (Utah 2024). In this opinion, we focus on the more recent remand proceedings, describing in some detail the findings made by the juvenile court on remand. And we recite the evidence relevant to those proceedings "in a light most favorable to the [remand] court's findings." *Id.* (cleaned up).

---

2. Tragically, Mother died in a car accident in December 2024, after both appellate opinions had been issued and while the case was on remand to the juvenile court. Given Mother's untimely passing, only Father's rights remain at issue. Nevertheless, we sometimes refer to Mother and Father collectively as "Parents," even though Mother is no longer a party to this appeal.

*DCFS Involvement with the Family*

¶6     Parents have seven children (collectively, Children)—Alice, Liam, and their five older brothers (Siblings). Alice was born in February 2015, and Liam was born in December 2016. DCFS first became involved with the family in 2017, when Alice was two years old, and Liam was just seven months old. *See In re A.H.*, 2022 UT App 114, ¶¶ 2, 4. Over the next few years, DCFS remained involved with the family, twice removing the Children—who were all minors at the time—from the family home and placing them in foster care. *See id.* ¶¶ 5–13. But due to the number of affected children—seven—DCFS could not always find placements that kept the Children together; often, they were placed in three groups, with the oldest children together, the middle children together, and Alice and Liam together. *See id.* ¶¶ 12–13. In August 2019, Alice and Liam were placed—for the first time—with the foster family who now wishes to adopt them and with whom they have lived for the past (nearly) seven years. *See id.* ¶ 13. During the remaining time prior to trial, which occurred a little over a year later, DCFS did not actively facilitate any sibling visitation but, instead, "left that mostly up to the foster parents," who "managed a few meet-ups on their own" at first, but whose efforts in this regard "diminished over time." *See id.*

*The Termination Trial*

¶7     As the case proceeded, Parents had each been provided with a court-appointed lawyer (collectively, Appointed Counsel). In the months leading up to trial, Appointed Counsel attended pretrial hearings where trial dates and pretrial disclosure deadlines were set. But as trial approached, Parents stopped communicating with Appointed Counsel because—without telling Appointed Counsel—they had retained a private attorney (Retained Counsel) to represent them in the case, and Retained Counsel instructed Parents not to communicate with Appointed Counsel. The juvenile court, on remand, found that Parents had

paid Retained Counsel a $1,000 retainer and that Retained Counsel "was acting as Parents' attorney and not as a consultant."

¶8     Retained Counsel represented to Parents that he would act as their attorney and would handle matters, including taking care of meeting (or arranging for the extension of) impending trial and disclosure deadlines. Parents reasonably understood that Retained Counsel had undertaken representation of them in the matter, and they reasonably relied on him to take care of the promised filings. And Parents refrained from independently seeking relief from the court, or from coordinating with Appointed Counsel, in reasonable reliance on Retained Counsel's assurances and instructions.

¶9     None of the three attorneys filed pretrial disclosures on behalf of Parents. Appointed Counsel did not do so, apparently because Parents—at Retained Counsel's urging—had ceased all communication with them and because both Appointed Counsel had a practice of not submitting such disclosures unless the client signed off on them first. Retained Counsel told Parents that he would seek an extension of the pretrial disclosure deadline, but he failed to do so. Indeed, prior to the first day of trial, Retained Counsel never entered an appearance or filed any documents.

¶10    The scheduled trial began on October 5, 2020, and took place by video conference due to the COVID-19 pandemic. All three of Parents' lawyers appeared. That morning, Retained Counsel filed his first documents in the case—a notice of limited appearance and a motion for extension of time and to continue the trial. The juvenile court chastised Retained Counsel for the "very, very late notice and request," *see In re A.H.*, 2022 UT App 114, ¶ 20, and it rejected any motion to continue as "untimely" and out of "compl[iance] with governing deadlines and procedures." After observing the court deny Retained Counsel's request for a continuance, Appointed Counsel opted not to ask for a continuance because they felt it would not be granted. Instead,

Appointed Counsel proceeded with the trial, and Retained Counsel remained involved only to assist with negotiations with the State and the guardian ad litem (the GAL) that were to occur that day. Those negotiations were successful in part, resulting in a stipulation that it was in Siblings' best interest for them to be placed in the permanent custody and guardianship of the oldest sibling's biological paternal grandparents (Grandparents). *See id.* ¶ 2 ("Father is the biological parent of the six youngest Children and the legal parent of all of them[.]"). But the stipulation did not include Alice and Liam, and as to them, the termination trial went forward later that day, with only Appointed Counsel representing Parents.

¶11 During that trial, the State presented testimony from "four DCFS caseworkers, two therapists, Mother's former and current probation officers, and the mother from the" foster family Alice and Liam were placed with. *See id.* ¶ 22. But when it was Parents' turn to present their case, the juvenile court—due to the failure of any attorney to file pretrial disclosures on behalf of Parents—imposed strict limitations on Parents' ability to present witnesses and evidence. The court allowed Parents to offer their own testimony and to call Grandparents, and it offered to allow them to call witnesses that were listed on the State's witness list. *See id.* ¶ 24. But the court did not allow Parents, even upon request, to present testimony from Siblings. *See id.* And no expert witness testified on Parents' behalf; none had been retained by any of Parents' attorneys, and Appointed Counsel made no request, at trial, to present any such testimony.

¶12 A few months after the trial, the juvenile court issued a written decision terminating Parents' rights as to Alice and Liam. *See id.* ¶ 27. It found sufficient statutory grounds for termination, and it found that DCFS had made "reasonable efforts towards the permanency goal of reunification." *Id.* ¶¶ 27–28. As to best interest, the court determined—in keeping with the parties' stipulation—that Siblings' interest was best served by a

permanent custody and guardianship arrangement with Grandparents. *See id.* ¶ 29.

¶13 But as to Alice and Liam, and based on the evidence presented during the trial, the court reached a different decision, concluding that their interest would be best served by adoption by the foster family and that termination of Parents' rights was strictly necessary to advance that interest. *See id.* The court reached that decision even though it meant permanently separating the Children, and even though the court acknowledged that Grandparents were "certainly appropriate caregivers." *Id.* It offered several reasons for its decision.

¶14 First, it noted that Alice and Liam were very young when they were first removed from the family home and that, as a result, they "had a very short time to be with [Siblings]." *Id.* Second, the court concluded that the bonds Alice and Liam had with Siblings were not particularly strong, opining that Alice and Liam had "little beyond a biological connection" with Siblings. *Id.* Third, the court discussed the unquestionably strong bonds that Alice and Liam had formed with the foster family. *See id.* Fourth, the court concluded that disrupting Alice and Liam's "placement at [that] time would be very detrimental" to them. *Id.* Fifth, the court expressed concern that, absent termination, Parents would retain some level of residual parental rights and might attempt "to regain custody of [Alice and Liam] in the future," an eventuality the court believed would "pose a risk to" Alice and Liam. *Id.* And finally, the court emphasized the importance of stability, offering its view that Alice and Liam, as well as the foster family, "deserve[d], and indeed need[ed], the highest level of legal protection available, which would be achieved through adoption." *Id.*

*Post-Trial Appeals*

¶15 After the juvenile court issued its ruling, Parents appealed to this court, challenging the juvenile court's best-interest decision

on its merits, and in addition asserting that DCFS had failed to provide reasonable efforts toward reunification and that all three lawyers—Retained Counsel and both Appointed Counsel—had rendered ineffective assistance. In October 2022, we issued our opinion reversing the juvenile court's best-interest determination on its merits and therefore declining to reach the other two issues. *See id.* ¶ 58. A few months later, our supreme court granted the GAL's petition for certiorari, agreeing to consider whether this court "erred in reversing the juvenile court's best interest determination and in vacating its order terminating [Parents'] parental rights as to" Alice and Liam. Then, in July 2024, the supreme court reversed this court's determination. *See In re A.H.*, 2024 UT 26. In its opinion, the supreme court concluded that the juvenile court, based on the evidence presented to it, had appropriately determined "that severing the legal connection with Alice and Liam's biological parents was strictly necessary to serve their best interest." *Id.* ¶ 73. The supreme court then sent the case back to this court "for consideration of the remaining issues in [Parents'] initial appeal." *Id.* ¶ 5.

### *The Remand Hearing*

¶16    Soon after the case was returned to this court, we issued an order remanding it to the juvenile court for supplementation of the record related to Parents' claims of ineffective assistance of counsel.[3] In the meantime, two events occurred that have had

---

3. In our order, we explained that, in criminal cases, requests for remand in the context of ineffective assistance claims are governed by rule 23B of the Utah Rules of Appellate Procedure. But even though that rule does not apply in child welfare cases, *see* Utah R. App. P. 1(f), we explained that "parents who provide extra-record evidence alleging ineffective assistance on appeal [may be] entitled to a remand similar to that provided by rule 23B to develop the record in support of their claims," *see In re adoption*

(continued…)

procedural consequences in this case. First, Mother passed away in December 2024, an event which served to moot all issues as to her. Second, in late 2024, both Appointed Counsel were appointed to fill judicial vacancies on the Fourth District Juvenile Court. Thereafter, Father filed a motion seeking the disqualification of the entire Fourth District Juvenile Court bench, given that Appointed Counsel (now both judges) would likely be called as witnesses at the remand hearing. That motion was granted by the presiding judge, and a senior judge from another district was later assigned to preside over and adjudicate the case.

¶17    The juvenile court on remand—a court we refer to herein as "the remand court"—then held a four-day evidentiary hearing. At the time of that hearing, Alice was ten years old and Liam was eight, and they had been in the continuous care of their foster family for about six years. At the hearing, thirteen witnesses testified and more than seventy exhibits were admitted into evidence. Father called eleven of those witnesses: himself; one of Alice and Liam's former foster parents (Former Foster Father); all five Siblings; Retained Counsel; both Appointed Counsel; and an expert witness (Expert). After Father presented his evidence, the State called two rebuttal witnesses, but it did not call either of Alice and Liam's current foster parents.

¶18    We include here a robust summary of the testimony presented at that hearing and the findings the remand court made afterward, because that testimony and the associated findings bear materially on the question of whether Appointed Counsel and Retained Counsel rendered ineffective assistance at the October 2020 trial.

---

*of P.P.*, 2024 UT App 62, ¶ 13, 549 P.3d 628. After our order was entered, Utah's rules of appellate procedure were amended to add a rule that expressly governs this situation and allows for such a remand. *See* Utah R. App. P. 55A.

¶19 **Sibling and Family Bonds**. Father presented extensive testimony intended to shed light on the strength of the bonds among the Children generally, and specifically on the strength of the bonds Alice and Liam had with Siblings. The remand court found that, prior to 2017 when DCFS became involved with the family, "[t]he [C]hildren had a close relationship with each other, with [Parents], and lived a normal family life." When the Children were first removed from the home, Alice was "terrified" and "sad and wanted her brothers," and she was eventually consoled by one of her older brothers. After a short stay at a group home, the Children were put into "three separate placements," though Alice and Liam remained together.

¶20 For a while, the Children enjoyed "at least weekly visitation" together and, during this time, the Children's "bond with each other," including Siblings' bond with Alice and Liam, "grew and was strengthened." Siblings remembered those visits as "positive" and "happy," where they "would talk, play games, [and] share stories." Alice and Liam would be "excited" to see Siblings, Alice "would hug" Siblings, and Liam "would always open his arms" to them. Former Foster Father testified about these "positive" and "mutually affectionate" visits that "reinforced the [C]hildren's emotional connection to their family of origin."

¶21 Father also testified about the Children's bonds with one another. He spoke of Alice "expressing a consistent desire to be with her [biological] family," even when she was separated from them. Father believed that this "showed that the [C]hildren maintained emotional awareness and attachment to their family members despite physical separation." He also remembered visits with Alice and Liam as "consistently loving and positive," "during which [Alice and Liam] ran to [Parents], hugged them tightly, and appeared joyful throughout," which Father believed "reflected an enduring parental bond."

¶22 The remand court found that, after the Children were removed from the family home a second time in May 2019, "all of the [C]hildren were extremely upset," yet "[n]obody talked to them about how they felt or balanced the harm that removal would cause with the risk of staying in the home." After removal, the Children were taken to a DCFS office and "placed in a small room for over two hours." One of the brothers "barricade[d] the door with toys," eventually leading to his arrest and placement at a "youth receiving center," where he "remained for two weeks with no change of clothing" and no opportunities for parental visits. The court found that the "removal was very traumatizing and impactful on the family" and that Siblings "were terrified about [Alice and Liam] leaving and worried if they would ever see them again."

¶23 Based on the testimony presented at the hearing, the remand court made findings about the Children's bonds with one another. In particular, the court found as follows:

> Testimony across the [S]iblings consistently demonstrated a deep mutual affection and enduring emotional bond. Each described their relationships as close, loving, and protective. Despite ordinary childhood disagreements, they testified that they always supported and defended one another, particularly in public or school settings. [Two of the brothers] explained that while they might argue at home, if someone else was in conflict with a brother, they would always intervene to protect him. This consistent loyalty reflected a unified and resilient sibling bond.

In this vein, the court discussed Siblings' testimony about the "numerous shared activities that strengthened their relationships," and it found that those "shared experiences created a foundation of trust, familiarity, and companionship

among" the Children. The court found that "[e]ach of the older brothers expressed love and protectiveness toward" Alice and Liam, and that Alice and Liam "were viewed as integral parts of the sibling group and were treated with affection and inclusion by their older brothers." And the court noted that all five of the Siblings "testified that they are a sibling group of seven" and that "they will always [be] a sibling group of seven."

¶24 The court also made specific findings about J.H., the brother closest in age to Alice and Liam; he is less than two years older than Alice and was only four years old at the time of the first removal. J.H. doesn't have as many memories of the pre-removal era as his older brothers do, so "his older brothers often [tell] him stories about their parents, about family trips, birthdays, and everyday memories from before he could remember," and J.H. testified that, "through those stories, he got to know his parents better." The court found that J.H.'s "testimony demonstrated that the [brothers'] recollections and storytelling served to strengthen [J.H.'s] emotional connection to his parents and preserve a sense of shared family identity even during times of separation." The court noted that J.H. "became visibly emotional when talking about" Alice and Liam and "had to pause for about a minute" before continuing to discuss his quite specific memories of them.

¶25 Siblings also "testified that [Parents] were consistently involved in their lives, providing structure, discipline, and care" and "foster[ing] a strong sense of belonging and family unity." Testimony showed that Parents were "active in [the Children's] schooling, attended events, and encouraged participation in church and community activities." Some of the Siblings described feeling "safe and comforted in [Parents'] presence," and the eldest son "described the home as a stable and loving environment." Siblings also testified that Parents "made sustained efforts to stay connected," even during periods of separation, and "consistently expressed love and encouragement" and "never gave up."

¶26 The court found Siblings' testimony to be "credible and persuasive" and that their "accounts of family relationships were consistent, detailed, and mutually reinforcing." The court also found that each of the Siblings "testified sincerely, with emotional insight and clarity." Based on their testimony, the court found that Siblings "share not only a deep bond with one another but also a strong, healthy, and enduring attachment to . . . [P]arents."

¶27 **Expert's Testimony and Opinions**. Father also presented testimony from Expert, who is a board-certified licensed clinical social worker with over twenty years of "experience in the fields of infant and early childhood mental health, attachment, and family systems therapy." Expert testified about various topics, including "attachment and placement transitions," the "importance of sibling bonds," "termination of parental rights and adoption related loss," and "therapeutic out of home placement transitions." Although Expert had never met or evaluated any of the Children, she became familiar with their circumstances after a forensic review of the "case record, reports, and testimony" regarding the family. The court found that Expert's testimony "reflected a thorough understanding of the [C]hildren's procedural history, placement experiences, and the issues before the [c]ourt." The court found that Expert's "forensic testimony was coherent, credible, and persuasive" and that Expert's "analytical process demonstrated methodological rigor, ethical objectivity, and adherence to the highest professional standards." The court offered its overarching view that Expert "provided the [c]ourt with reliable, evidence-based insight into the emotional and developmental needs of" the Children.

¶28 Expert first "testified extensively on attachment and disruption of secure attachments." She stated that "[a]chieving a secure attachment in an out-of-home placement is [a] positive indicator of a child's mental health and wellbeing." She acknowledged that "abruptly severing a secure attachment can be traumatic" to a child. But she offered her view that the inquiry

"cannot be guided through a myopic lens of attachment alone" and that, when done correctly and in appropriate cases, it is possible and sometimes even preferable to transition a child out of a secure attachment. In order to "safely" accomplish this, the transition process "must be gradual, mindful, and supported by a mental health professional." She explained that successful transitions involve cooperation between caregivers to maintain the child's routines and emotional security, and she offered her view that "the more people who love a child the better—children shouldn't lose anyone in the process." And she said that, ideally, "the prior caregiver should be invited to remain part of the child's emotional network, giving the child implicit permission to attach to new caregivers while maintaining existing bonds."

¶29　Expert stated that "[d]espite the difficulty in transitions from a foster placement to a relative placement, [a relative placement] is still the optimal permanency outcome for children." Specifically, she opined that

> kinship placement provides continuity of identity, culture, and familial narrative, which are critical for a child's sense of belonging and long-term emotional health. . . . [C]hildren placed with relatives maintain connections to their family history, which anchors their self-concept and reduces feelings of abandonment associated with removal and separation.

Expert "acknowledged that kinship placement is not appropriate in every circumstance," but she "emphasized that where a family member can provide safety, stability, and structure, that setting is generally superior to non-relative foster care." And she testified "that long-term family placements are particularly beneficial when siblings can remain together," because "siblings share a unique and validating connection that anchors them to their shared identity and experiences."

¶30　Applying these principles to the case at hand, Expert opined that "it is not in the best interests of [Alice and Liam] to separate them from their family," that it is "very likely" they "would transition well into the home with Grandparents and [Siblings]," and that it "is in [their] long-term best interests to remain connected to [Siblings], Parents, Grandparents, relatives, community, and culture."

¶31　Next, Expert "testified at length regarding the developmental and emotional benefits of children being placed together with their siblings whenever safely possible." Expert "explained that sibling bonds are foundational to a child's identity formation and represent the longest-lasting family relationships most individuals will have in life," and that sibling "relationships are particularly significant for children who have experienced separation, trauma, or loss, as they provide familiarity, shared memory, and continuity of family experience." She stated that "children who are separate from siblings following removal from their parents often experience an additional layer of grief, confusion, and loss," which "compounds the trauma of parental separation by depriving children of one of their primary sources of emotional regulation and mutual reassurance."

¶32　Expert "described sibling relationships as 'the single most protective factor' for children in the child welfare system who experience separation from parents." She explained that this is so because "[s]iblings frequently serve as one another's attachment figures, particularly in families affected by instability or neglect, and thus function as key protective factors during adversity." She also testified that siblings should be separated "only as a last resort, and only when joint placement would clearly endanger one or more of the children or compromise therapeutic treatment." And she offered her view that, if siblings cannot be kept together, then "maintaining consistent, meaningful contact is critical" "to preserve relational continuity," "reduce trauma responses," and "reinforce a child's sense of family belonging."

¶33 After listening to and considering Expert's testimony on sibling bonds, the remand court made the following finding:

> The [c]ourt finds [Expert's] testimony on sibling permanency credible and strongly supported by the empirical findings [of the studies Expert discussed]. Together, these authorities establish that sibling relationships are fundamental to emotional security, placement stability, and long-term well-being. The evidence presented demonstrates that permanency planning that preserves sibling unity produces measurably superior outcomes and aligns with best practices in child welfare and attachment science.

¶34 Expert also "testified that there are several long-term consequences associated with the termination of parental rights that are devastating for children." In this vein, Expert discussed two different types of loss children may experience after their parents' rights are terminated. She described the first type of loss as "ambiguous loss," which is "a psychological state of unresolved grief where the loved one remains psychologically present but physically absent." The second type of loss Expert described was "definitive loss," which is "the legal and physical separation from their biological parents" and siblings. Related to this loss, Expert testified that in "her clinical experience, children who are encouraged to talk about their biological families and allowed to maintain safe, appropriate contact show greater emotional stability and stronger attachment to adoptive caregivers." Expert presented supporting research for these opinions. The court found that research reinforced the idea that "termination of parental rights should never happen if there is a safe viable alternative that will give a child legal permanency and a permanent connection to their biological family," and that "[w]hen there is a safe and appropriate caregiver that can take permanent custody and guardianship of a child and maintain

family connections, the court should always take th[at] option." Expert explained that, empirically, "kinship care tends to produce better outcomes in school performance, mental health stability, and social functioning because the child's sense of continuity is maintained." She discussed studies indicating that adopted children face "increased risk of juvenile delinquency" and "suicidality" relative to "their non-adopted peers," and indicating that "adoption is not a singular event but a lifelong process marked by recurring developmental challenges related to loss, identity, and belonging." And she opined that "the future risk of harm associated with termination of parental rights and adoption far outweighs the temporary heartache of adjusting placements."

¶35 On this topic also, the remand court found Expert's testimony to be "credible and compelling," "empirically grounded[,] and profoundly relevant to the emotional well-being of" Liam and Alice, and for these reasons, the court "accord[ed] significant weight to [Expert's] analysis of ambiguous and adoption-related loss."

¶36 Finally, Expert "testified that therapeutic out-of-home placement transitions must be gradual, mindful, planned, and purposeful, and that each step of the process must be guided by a mental health professional skilled in attachment and transitions." Expert opined that even when children are in secure attachments, as Alice and Liam are in with their foster family, they are "capable of adapting successfully when transitions are handled therapeutically, at the child's pace, and under professional supervision." Expert explained that this works best when the transition process occurs in "distinct phases: preparation, overlap, and stabilization." The court found Expert's testimony on this topic to be "consistent, evidence-based, and highly persuasive, demonstrating that gradual, professionally guided transitions produce superior emotional outcomes for children."

¶37 **Testimony from the Attorneys**. The remand court also made findings regarding Retained Counsel's and Appointed Counsel's performance. Some of those findings have been discussed already. *See supra* ¶¶ 7–10. We include here a discussion of additional findings the court made regarding the attorneys.

¶38 Regarding Appointed Counsel, the remand court found that, in the months leading up to trial, Appointed Counsel anticipated that the case would be resolved short of trial by placing the Children together with Grandparents. Appointed Counsel for Father testified "that if Father could not get custody back, [Father] wanted the [C]hildren placed" together with Grandparents. The court also found that Appointed Counsel for Father "admitted that he did not file pretrial disclosures on behalf of Father, including a witness list and exhibit list, as required by the court's pretrial scheduling order," even though he had previously been present when the pretrial disclosure deadline was set. Appointed Counsel for Father testified that he did not file pretrial disclosures because "Father had not personally reviewed or approved them" and it was his policy not to file disclosures until his client signed off on them first. And Appointed Counsel for Mother made the same admission, even going so far as to agree that his actions "prejudiced Mother because she could then not call any witnesses or present any evidence." Appointed Counsel for Father acknowledged "that the juvenile court would not allow [him] to put on witnesses" because of the lack of disclosures.

¶39 Appointed Counsel for Father testified that Father sent him an email on October 5, 2020—the first day of trial—in which Father had included "a list of witnesses [he] wanted to testify." Siblings and Former Foster Father were all originally on this list. But the remand court found that Appointed Counsel for Father did not know or understand that Former Foster Father was also on the State's witness list—meaning he would have been able to testify at the termination trial if Appointed Counsel had called him. Importantly, the court found that Father's emailed witness

list was "sent . . . prior to the State shifting its position to wanting to separate the sibling group," meaning that, at the time he put together the list, Father would not have known of any need to call an expert witness on sibling bonds, and that "[t]his change in tactic may have resulted in Father finding different witnesses—like an expert witness [that] could testify to the harm caused by separating siblings, attachment, and ambiguous loss." On remand, Appointed Counsel for Father acknowledged that he would have been able to obtain such an expert and that it would have been "helpful," but that he did not do so. Appointed Counsel for Mother recognized that "in hindsight, they probably should have asked for a continuance based on the new dynamics and shift in DCFS['s] desire to permanently separate the [Children]."

¶40   Retained Counsel testified that the "initial $1,000" fee was only a "consultation" fee "for limited engagement." But the remand court found Retained Counsel's testimony on this point "not credible," and it made a specific finding—based on Parents' "text messages, bank records, and audio recordings"—that Retained Counsel "was acting as Parents' attorney and not as a consultant." As already noted, Retained Counsel failed to live up to the promises he made to Parents, and the court found that Retained Counsel's actions "resulted in the loss of the opportunity to extend discovery deadlines, adjust trial settings, or otherwise prepare a defense before trial commenced."

¶41   The court also made findings about Retained Counsel's credibility. At the hearing, Retained Counsel "refused to answer" certain questions and invoked his Fifth Amendment right. Nonetheless, "judicial findings, sanctions orders, [and] criminal case filings arising from his professional conduct" were admitted into evidence. That evidence showed that, at the time he represented Parents, Retained Counsel was "the subject of ongoing attorney discipline and criminal proceedings." Because of this, the court found that Retained Counsel's "refusal to answer questions about these proceedings and his invocation of the Fifth

Amendment, when viewed alongside these exhibits, substantially undermine[d] his credibility and support[ed] an adverse inference that his professional and criminal misconduct was ongoing during the time of his representation of [Parents]."

## ISSUE AND STANDARD OF REVIEW

¶42 The sole issue before us is whether Parents' attorneys rendered ineffective assistance at the October 2020 termination trial.[4] "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *In re R.D.*, 2024 UT App 91, ¶ 17, 554 P.3d 318 (cleaned up), *cert. denied*, 558 P.3d 90 (Utah 2024).

---

4. As already noted, Parents raised another issue in their original appeal: "Whether the juvenile court erred in determining [that] DCFS made reasonable efforts to keep the family together when DCFS failed to timely facilitate placement with Grandparents and ensure sibling visitation, as required by statute." Given our resolution of Father's ineffective assistance claim, we do not address the reasonable-efforts issue, other than to offer our view that Father has raised matters related to DCFS malfeasance in the appropriate procedural location. Indeed, now that our supreme court has made clear that such matters may not generally be raised in the best-interest portion of the inquiry, *see In re A.H.*, 2024 UT 26, ¶¶ 51–61, similarly affected parents in future cases would seem to have no place other than the reasonable-efforts portion of the inquiry in which to raise such matters. Thus, in our view Father raised these arguments in the right place, and other similarly situated parents should be afforded an opportunity, in connection with reasonable-efforts inquiries, to make arguments regarding actions DCFS may have taken (or not taken) that, in their view, contributed to the deterioration of family bonds or the unavailability of kinship placements.

ANALYSIS

¶43    Under Utah law, "a parent or legal guardian facing an action initiated by the state" regarding child welfare or termination of parental rights has the right to effective counsel. *See* Utah Code § 78B-22-201(1)(b); *see also In re E.H.*, 880 P.2d 11, 13 (Utah Ct. App. 1994) (holding that appellants in child welfare proceedings are "entitled to effective assistance of counsel," and "adopt[ing] the *Strickland* [*v. Washington*] test to determine a claim for ineffective assistance of counsel in proceedings involving termination of parental rights").

¶44    To establish ineffective assistance of counsel under the prevailing test, "a party must show that counsel's performance was objectively deficient and that counsel's deficient performance prejudiced the case." *In re H.H.*, 2024 UT App 25, ¶ 96, 546 P.3d 39 (cleaned up); *see also* Utah Code § 78B-22-201(1)(b) (providing a right to counsel in termination of parental rights proceedings). To establish deficient performance, Father "must overcome the strong presumption that [Retained Counsel and Appointed Counsel] rendered adequate assistance by persuading the court that considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *See In re C.M.R.*, 2020 UT App 114, ¶ 20, 473 P.3d 184 (cleaned up).

¶45    To establish prejudice, Father must show there was a "reasonable probability that the outcome of [the] case would have been different absent counsel's error." *See id.* ¶ 21. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." *Id.* (cleaned up). "In evaluating the likelihood of a different result, we consider the totality of the evidence before the judge, bearing in mind that some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *In re A.H.*, 2021 UT App 57, ¶ 37, 493 P.3d 81 (cleaned up).

¶46 We begin our analysis by addressing whether Father's right to effective assistance of counsel attached to Retained Counsel, and we conclude that it did. We then transition to an analysis of whether Father's attorneys rendered deficient performance, and we conclude that they did. Finally, we address Father's contention that this deficient performance prejudiced him during the October 2020 trial. For the reasons discussed, we find merit in Father's ineffective assistance claim.

## I. Retained Counsel

¶47 As noted, Father contends that Appointed Counsel *and* Retained Counsel each rendered ineffective assistance. As discussed more fully later, the State and the GAL take issue with parts of Father's argument on its merits, but as a threshold matter, the GAL asserts that Father's right to effective assistance of counsel did not extend to Retained Counsel because Retained Counsel "was never counsel of record" in the case. We find the GAL's position unpersuasive, both legally and factually.

¶48 While no Utah appellate court has addressed this legal issue, other courts have, and those courts have concluded that "[a]n attorney's constitutional ineffectiveness can manifest itself at trial even though the attorney never appears in court." *Stoia v. United States*, 22 F.3d 766, 769 (7th Cir. 1994); *see also United States v. Logan*, 257 F. Supp. 3d 880, 888 (W.D. Mich. 2017) (stating that there is no "bright-line rule that an attorney must be counsel of record before a defendant can make a valid claim of ineffective assistance against him [or her]"), *aff'd*, 910 F.3d 864 (6th Cir. 2018). For instance, "an attorney hired to do 'behind the scenes' work may, through deficient performance, negatively impact the trial counsel's ability to give the defendant an adequate defense." *Stoia*, 22 F.3d at 769. Thus, there is no requirement "that a trial court must be aware of a retained attorney's out of court participation in the case to implicate" a litigant's right to effective assistance of counsel. *Id.*; *see also Roderick v. Ricks*, 2002 UT 84, ¶ 32,

54 P.3d 1119 ("An attorney-client relationship exists when the client reasonably believes the attorney represents the client's legal interests."). We consider these authorities persuasive, and we accordingly reject the GAL's legal argument that an attorney must have entered an official appearance in a case before being responsible for effectively representing the client.

¶49 Moreover, as a factual matter, the remand court clearly found, based on the evidence presented at the hearing, that Parents had formally hired Retained Counsel to represent them in the case. Specifically, the court found that Parents had paid Retained Counsel a $1,000 retainer and that Retained Counsel "was acting as Parents' attorney and not as a consultant." The court expressly rejected Retained Counsel's assertion that the $1,000 payment was merely a "consultation" fee "for limited engagement," finding that Retained Counsel's testimony on this point was "not credible." Indeed, the court found that, because Retained Counsel represented to Parents that he would act as their attorney, Parents reasonably understood that Retained Counsel had undertaken representation of them in the matter and that he would take care of satisfying or extending impending trial and disclosure deadlines. The GAL does not challenge any of these factual findings as clearly erroneous. *See In re S.H.*, 2005 UT App 324, ¶ 12, 119 P.3d 309 ("We review the juvenile court's findings for clear error . . . .").

¶50 For these reasons, we conclude that Father's right to effective assistance of counsel extended not just to his appointed attorney but also, in this case, to Retained Counsel.

## II. Deficient Performance

¶51 We turn now to the merits of Father's claim that his attorneys each rendered ineffective assistance, and we first address whether they performed deficiently. Father asserts that "Retained Counsel did nothing and lied to Parents," so much so that the "deficiency of [Retained Counsel's] performance cannot

be seriously contested." And he contends that "Appointed Counsel failed to comply with deadlines, prepare for trial, or request a continuance," which "[c]ompound[ed] the disastrous effects of [Retained Counsel's] deficient performance" and constituted "independent" deficient performance.

¶52 The State agrees with Father on this point. Indeed, the State not only concedes, but "readily" concedes, that "the performance of all of Parents' counsel was objectively deficient." The State characterizes as "well-taken" Father's assertion that all of Parents' attorneys "provided objectively deficient representation," and it agrees with Father that "[t]he complete failure of any of their attorneys to even file pretrial disclosures, and to seek expert testimony, precluded Parents from presenting testimony which could conceivably have helped in their defense."

¶53 The GAL, however, contests the point. With regard to Retained Counsel, the GAL asserts (as discussed above) that Retained Counsel's actions cannot be the subject of an ineffective assistance claim. And with regard to Appointed Counsel, the GAL contends that Appointed Counsel did not perform deficiently because "Appointed [C]ounsel's performance must be considered in terms of Father's choices" and because, in any event, Appointed Counsel "could well have had tactical reasons to decline to call" certain witnesses.

¶54 We have already rejected the GAL's argument that Retained Counsel's actions cannot be the subject of an ineffective assistance claim. *See supra* Part I. And the GAL makes no other argument regarding Retained Counsel—that is, not even the GAL contends that Retained Counsel's performance was reasonable. It quite clearly wasn't. After Parents paid Retained Counsel a $1,000 retainer, he told them that he would act as their attorney and would take care of matters, including taking care of meeting impending trial and disclosure deadlines. He said he would seek an extension of the pretrial disclosure deadline, but he failed to

actually do so. Not only did he break that promise to Parents, but he also never—prior to the first day of trial—entered an appearance or filed any documents with the court on behalf of Parents. And when Retained Counsel arrived on the first day of trial requesting a continuance, the court rejected any continuance as "untimely" and out of "compli[ance] with governing deadlines and procedures." Because of these actions, the remand court specifically found that Retained Counsel's actions "resulted in the loss of the opportunity to extend discovery deadlines, adjust trial settings, or otherwise prepare a defense before trial commenced." There was no conceivable strategic value to Retained Counsel's decisions—as Father persuasively puts it, Retained Counsel simply "did nothing." On this record, and based on the court's findings, the conclusion is inescapable that Retained Counsel's performance was objectively unreasonable and thus deficient.

¶55    Indeed, as we see it, Retained Counsel's actions were the primary reason for the trouble Parents found themselves in at the October 2020 trial. Not only did he do nothing, but he instructed Parents not to communicate with their Appointed Counsel, which instruction Parents followed, and that action led to problems with Appointed Counsel as well.

¶56    But Appointed Counsel also performed deficiently here in their own right. Despite the lack of communication with their clients, they remained as counsel of record in the case—that is, they did not seek to withdraw. Yet they took no steps to make sure that their clients complied with pending pretrial disclosure deadlines, apparently opting not to do so because they had a policy not to submit such disclosures without client sign-off. Nor did they seek an extension of those deadlines or a continuance of the trial. This action was objectively unreasonable. *Cf. Dahl v. Dahl*, 2015 UT 79, ¶ 83, 459 P.3d 276 ("Pretrial discovery and disclosure are basic skills that we expect all attorneys to possess." (cleaned up)).

¶57　The GAL attempts to defend Appointed Counsel's actions, asserting that there may have been tactical explanations for their failure to meet disclosure deadlines and that we must assess their performance in light of Father's conduct. In particular, the GAL cites *In re R.G.*, 2023 UT App 114, 537 P.3d 627, in which this court "rejected the notion that a party can assert a claim of ineffective assistance where that party failed to communicate with counsel between the time of the pretrial hearing and the termination trial and failed to appear at the trial." *Id.* ¶ 19. There, the client "fail[ed] to appear or to assist." *Id.*

¶58　We certainly acknowledge that Appointed Counsel found themselves in a tough spot after their clients stopped communicating with them and, as noted, that circumstance was Retained Counsel's fault. Indeed, on this basis alone, *In re R.G.* is distinguishable: the lack of communication here did not have its genesis in a client who stopped caring about the case. Here, the lack of communication rests at the feet of one of the attorneys—Retained Counsel—who specifically told Parents to cease communication with Appointed Counsel.

¶59　But even placing the blame for the lack of communication fully on Retained Counsel's shoulders, Appointed Counsel's actions in response to the situation were not reasonable. They remained counsel of record yet took no action aimed at preparing Parents for trial. They did not file pretrial disclosures. They did not seek an extension of those deadlines. They did not ask for a continuance of the trial, even after learning—on the first day of trial—that the State had changed its position about keeping the Children together and was going to advocate for splitting up the Children. Indeed, Appointed Counsel for Mother acknowledged, during the remand hearing, that "in hindsight, they probably should have asked for a continuance based on the new dynamics and shift in DCFS['s] desire to permanently separate the [Children]." Appointed Counsel's actions left Father in the position of being unprepared for the trial and unable to call many

of the witnesses that he would have needed to call in order to present an effective case.

¶60 The GAL argues briefly that Appointed Counsel could have had strategic reasons, at trial, not to call the witnesses that Father later called on remand. But the GAL offers no possible strategic reason that Appointed Counsel could have had for consciously deciding not to call Siblings or Former Foster Father. And as a factual matter, the juvenile court specifically ruled that Parents would only be able to call themselves, Grandparents, and witnesses already listed by the State (a list that, apparently unbeknownst to Appointed Counsel, included Former Foster Father). Here, we see no strategic reason for Appointed Counsel's failure to call additional critical witnesses.

¶61 Finally, the GAL contends that Appointed Counsel's decision not to seek a continuance was not deficient performance, asserting that any such request would have been futile. At trial, the court denied Retained Counsel's request for a continuance, so Appointed Counsel opted not to ask for a continuance "because they felt it would not be granted." "The decision not to pursue a futile motion is almost always a sound trial strategy, [so] counsel's failure to make a motion that would be futile if raised does not constitute deficient performance." *In re F.C.G.*, 2023 UT App 55, ¶ 11, 531 P.3d 763 (cleaned up). But we see two problems with the GAL's position.

¶62 First, Appointed Counsel could have—and arguably should have—asked for a continuance (or for withdrawal) much earlier, once Parents stopped communicating with them and once they knew they wouldn't be able to file pretrial disclosures or effectively prepare for trial. There is no indication, in this record, that an *earlier* motion for a continuance (or related relief) would have been futile. Indeed, one of the reasons the court gave for denying the day-of-trial motion for continuance was

because it was "untimely" and out of "compli[ance] with governing deadlines and procedures." A motion made weeks before the scheduled trial date and explaining that communication had ceased would have stood a better chance of success.

¶63   Second, there was an alternative basis for a successful day-of-trial motion for a continuance that was not attempted. As the day unfolded, it became apparent—especially after the negotiations that took place throughout the day—that the State was changing its position and was, apparently for the first time, taking the position that the Children should be split up, with Siblings going to Grandparents and with Alice and Liam staying with their foster family for adoption. During the run-up to trial, Appointed Counsel had been under the continuous impression that the Children would remain together; indeed, the remand court found that the State didn't "shift[] its position" about "wanting to separate the sibling group" until the day of trial. At that point, Appointed Counsel had a new basis for seeking a continuance: they had theretofore been unaware of the State's new position, and they could have asked for more time to respond to the State's change in position. Indeed, Appointed Counsel for Mother acknowledged, during the remand hearing, that "in hindsight, they probably should have asked for a continuance based on the new dynamics and shift in DCFS['s] desire to permanently separate the [Children]." But despite the State's change in position, Appointed Counsel did not seek a continuance on that basis. We are unpersuaded that such a motion would have been futile, given that the reason for the continuance apparently surfaced only that day. Appointed Counsel's actions, including their failure to seek such a continuance, doomed any effort they might have made to present testimony from an expert witness on topics such as sibling bonds, adoption-related loss, and attachment and placement transitions. As noted, Appointed Counsel acknowledged that such an expert "would have been helpful" and would have been available to them.

¶64 For all of these reasons, we conclude—like the State has—that both Retained Counsel and Appointed Counsel performed deficiently in connection with the October 2020 trial.

### III. Prejudice

¶65 Next, we assess whether the attorneys' deficient performance prejudiced Father. As noted above, to establish prejudice, Father must show that there was a "reasonable probability that the outcome of [the] case would have been different absent counsel's error." *In re C.M.R.*, 2020 UT App 114, ¶ 21, 473 P.3d 184. We agree with Father that, if Retained Counsel and Appointed Counsel had not performed deficiently and if the juvenile court at trial had heard the evidence presented at the remand hearing, there is a reasonable probability that the October 2020 trial would have come out differently.[5]

¶66 Our determination in this regard is informed by an analysis of the reasoning underlying the juvenile court's decision to terminate Parents' rights as to Alice and Liam.

¶67 In our original opinion, we discussed the reasons for the juvenile court's decision. *See supra* ¶ 14. Those reasons fall into

---

5. The prejudice analysis of an ineffective assistance claim is by its nature a backward-looking inquiry, where we "consider a hypothetical—an alternative universe in which the trial went off without the error." *See State v. Mason*, 2024 UT App 171, ¶ 32, 562 P.3d 1158 (cleaned up), *cert. denied*, 570 P.3d 658 (Utah 2025). This remains the case even though any new trial ordered as a result of ineffective assistance must be "conducted in [a] present-tense fashion, with the effective date of the inquiry being the date of the hearing, trial, or other judicial determination." *See In re A.H.*, 2024 UT 26, ¶ 55 (cleaned up). So, for purposes of our prejudice inquiry, we assess whether the October 2020 trial would have come out differently if the court, at that moment in time, had heard the testimony presented at the remand hearing.

three general categories: (1) the court's conclusion that Alice and Liam's bonds with Siblings and Parents were not particularly strong; (2) the court's concerns about the risks of changing placements, especially where Alice's and Liam's attachment to their foster family was strong; and (3) the court's conclusions about the longer-term effects of termination of parental rights and adoption. At the remand hearing, much of the evidence Father presented was aimed at rebutting these conclusions. In the paragraphs that follow, we explain that Father's evidence was persuasive on these points to the remand court, and based on how that court reacted to this evidence, we think it reasonably likely that the outcome of the October 2020 trial would have been different had the juvenile court at that time heard the evidence that was later presented at the remand hearing.

¶68 **Bonds with Siblings and Parents**. In its original ruling, the juvenile court deemed important the fact that Alice and Liam "were very young" when they were removed from the family home and, "as a result, they had a very short time to be with [Siblings]." *In re A.H.*, 2022 UT App 114, ¶ 29. Indeed, it considered any rupture of the sibling bonds to be a matter of small concern, offering its view that Alice and Liam had "little beyond a biological connection" with Siblings. *Id.* But because of the attorneys' failure to file pretrial disclosures (and their lack of awareness of who was listed in the State's disclosures), the juvenile court did not hear testimony, during the October 2020 trial, from any of the Siblings, from Former Foster Father, or from Expert. The testimony on remand—from those new witnesses as well as from Father—painted a very different picture than that which the court was shown the first time around.

¶69 On remand, after hearing from the new witnesses, the court made very different findings regarding the Children's bonds with one another. It specifically found that Siblings' testimony "consistently demonstrated" that the Children had "a deep mutual affection and enduring emotional bond" with one

another. It also found that the bond between the Children was "unified and resilient" and that the Children's relationships with each other were "close, loving, and protective." And in general, it found Siblings' testimony "credible and persuasive," stating that their "accounts of family relationships were consistent, detailed, and mutually reinforcing." The court found that "each child testified sincerely, with emotional insight and clarity."

¶70 The remand court appeared particularly moved by the testimony offered by J.H., the brother closest in age to Alice and Liam. J.H. testified that because he was younger, he had fewer memories of his family's life before removal. To help with this, "his older brothers often told him stories about their parents, about family trips, birthdays, and everyday memories from before he could remember." He testified that "through those stories, he got to know his parents better." The court found that his "testimony demonstrated that the [brothers'] recollections and storytelling served to strengthen [J.H.'s] emotional connection to his parents and preserve a sense of shared family identity even during times of separation." And the court made particular note that J.H. "became visibly emotional when talking about" Alice and Liam and when describing his remarkably vivid memories of them before the sibling group was separated.

¶71 The court also made note of the testimony offered by Former Foster Father, who described how Alice and Liam "maintained a positive and affectionate bond with [Siblings] during visits" and "enjoyed spending time with them." Based on his testimony, the court noted that Siblings' visits "reinforced [Alice's and Liam's] emotional connection to their family of origin and did not cause distress or behavioral regression following contact." The court found Former Foster Father "to be a credible witness" and "accord[ed] significant weight to his testimony."

¶72 In addition, the court made findings about Parents' relationship with the Children. Siblings testified that Parents

"made sustained efforts to stay connected," even during periods of separation, and "consistently expressed love and encouragement" and "never gave up." And Siblings described their Parents as "consistently involved in their lives," which in turn "foster[ed] a strong sense of belonging and family unity." From this, the court found that the Children "share not only a deep bond with one another but also a strong, healthy, and enduring attachment to their parents."

¶73 From the tenor of the remand court's findings, it is evident that the testimony from the new witnesses about Alice and Liam's bonds with Siblings and Parents painted those relationships in a new light. Had the juvenile court heard this additional testimony in October 2020, we deem it extremely unlikely that the court would have found that Alice and Liam "have little beyond a biological connection" with Siblings.

¶74 In addition to hearing new evidence about the strength of the bonds between and among the Children, the remand court also heard evidence from Expert about the importance of preserving sibling bonds. During her testimony, in which she repeatedly referenced empirical studies, Expert "described sibling relationships as the single most protective factor for children in the child welfare system who experience separation from parents." She "testified at length regarding the developmental and emotional benefits of children being placed together with their siblings whenever safely possible." And she opined specifically that in relation to Alice and Liam, it was "very likely" they "would transition well into the home with Grandparents and [Siblings]" and that it was in their "long-term best interests to remain connected to [Siblings], Parents, Grandparents, relatives, community, and culture." The court found Expert's testimony to be "credible and strongly supported by the empirical findings" that "establish that sibling relationships are fundamental to emotional security, placement stability, and long-term well-being." And the court noted that

"[t]he evidence presented demonstrate[d] that permanency planning that preserves sibling unity produces measurably superior outcomes and aligns with best practices in child welfare and attachment science."

¶75    The lack of trial testimony—like that presented by Expert on remand—about the importance of sibling bonds was crucial not only to the juvenile court's original ruling but also to the supreme court's reversal of our decision. We had originally offered our view—based on caselaw and social science literature—that sibling bonds were important, especially "to children who experience chaotic circumstances like abuse or neglect." *In re A.H.*, 2022 UT App 114, ¶ 42 (citing cases and articles). But the supreme court was critical of us on this point, chiding us for relying on cases and articles when the trial record itself contained no such evidence. *See In re A.H.*, 2024 UT 26, ¶ 50 ("The role of an appellate court is to review the record as it exists. Here, the court of appeals relied upon generalized observations from caselaw and academia about the importance of sibling relationships and then determined that those observations outweighed the specific evidence about Alice and Liam that was in the record.").

¶76    At the remand hearing, Father filled this evidentiary gap by presenting precisely the sort of evidence that our supreme court found lacking. And that evidence was extremely persuasive to the remand court. Under these circumstances, we consider it relatively clear that Father was prejudiced by his attorneys' failure to present both lay and expert testimony about the strength and importance of the bonds Alice and Liam had with Siblings.

¶77    **Changing Placements, Especially Where Attachment Is Strong**. In its original ruling, the juvenile court emphasized the strength of the bonds Alice and Liam had with their foster family, and it concluded that "disruption" of that placement "would be very detrimental" and would "put them at unnecessary risk for

future emotional and mental health issues." *In re A.H.*, 2022 UT App 114, ¶ 29. But Appointed Counsel did not present any testimony from an expert witness concerning these issues, and therefore the juvenile court made these findings and expressed these concerns in the absence of such evidence. During the remand hearing, Expert testified about these issues at length, and the remand court found her testimony on these topics to be "consistent, evidence-based, and highly persuasive, demonstrating that gradual, professionally guided transitions produce superior emotional outcomes for children." And the remand court found Expert's testimony, as a general matter, to be "coherent, credible, and persuasive," and presented with "methodological rigor, ethical objectivity, and adherence to the highest professional standards." It is evident from the remand court's findings that these issues were presented in a completely different light than during the October 2020 trial.

¶78 Expert began her testimony on these topics by noting that children often "securely attach to their foster parent," and by explaining that this was "part of the normal child development trajectory." Thus, Expert viewed Alice and Liam's secure and positive attachment to their foster family as a good thing and as something to be valued, not only for its own sake but also as an indication that Alice and Liam are capable of securely attaching to a caregiver. And Expert acknowledged that disrupting this sort of strong attachment can certainly be "traumatic" to a child.

¶79 But Expert explained that a placement with relatives is "the optimal permanency outcome" for children and that permanency outcomes "cannot be guided through a myopic lens of attachment alone." She explained that "kinship placement provides continuity of identity, culture, and familial narrative, which are critical for a child's sense of belonging and long-term emotional health." Such placements help a child "maintain connections to their family history," which "anchors their self-concept and reduces feelings of abandonment associated with removal and

separation." And she explained that, empirically, "kinship care tends to produce better outcomes in school performance, mental health stability, and social functioning because the child's sense of continuity is maintained." She testified that "long-term family placements are particularly beneficial when siblings can remain together," because "siblings share a unique and validating connection that anchors them to their shared identity and experiences." And she offered her view that "separating siblings should be considered only as a last resort, and only when joint placement would clearly endanger one or more of the children or compromise therapeutic treatment."

¶80 Operating from these premises, Expert offered her view that, in order to further the objective of prioritizing placement with relatives, it is often better to transition a child out of a foster placement—even one in which a strong attachment has been formed—so that the child can be placed with relatives. She emphasized that a secure foster-family attachment should ideally not be abruptly severed. But she explained that, when done gradually, mindfully, and supported by a trained mental health professional, children can and should be safely transitioned out of even secure foster-family attachments and into kinship placements. She testified that "successful transitions involve cooperation between caregivers" and that, when done appropriately, the child "shouldn't lose anyone in the process" and the prior caregiver "should be invited to remain part of the child's emotional network." She stated that this sort of gradual, cooperative transition gives "the child implicit permission to attach to new caregivers while maintaining existing bonds."

¶81 Based on her forensic review of Alice and Liam's case, and even after acknowledging the strong attachment they had formed with their foster family, Expert opined that "it is not in the best interests of [Alice and Liam] to separate them from their family." She offered her view that Alice and Liam would likely "transition

well" from the foster family "into the home with Grandparents and [Siblings]" if the transition was undertaken in the manner she described. And she opined that this sort of transition should be attempted here because it is in Alice and Liam's "long-term best interests to remain connected to" Father and Siblings, as well as to their "relatives, community, and culture."

¶82 Judging from the remand court's description of Expert's testimony on these topics and from its findings after listening to that testimony, it is clear that this testimony would have made a difference had it been presented at the October 2020 trial. During the original trial, the juvenile court gave great weight to the strength of the positive attachment Alice and Liam had with their foster family. But no testimony was presented at that trial about safe and gradual transitions out of such placements and into kinship placements; certainly, no testimony was presented about how, in many cases, such transitions are the optimal outcome for a child despite the potential for some temporary short-term discomfort. When Expert presented this testimony at the remand hearing, the court found it to be extremely persuasive. We therefore discern a reasonable probability that the juvenile court, had it heard testimony like this during the original trial, would have made different findings and reached different conclusions about these topics.

¶83 **Long-Term Effects**. Lastly, the court expressed concern that "absent termination, Parents . . . might attempt to regain custody of [Alice and Liam] in the future," and it concluded that, in order to protect Alice and Liam's "stability," termination and adoption were in their best interest. *In re A.H.*, 2022 UT App 114, ¶ 29 (cleaned up). But Appointed Counsel did not present any expert testimony on these topics either, which left the juvenile court to make its determination without the benefit of such testimony. On remand, Expert testified at some length about "the enduring harms associated with termination of parental rights and the experience of ambiguous loss." The remand court

characterized this testimony as "credible and compelling" and gave it "significant weight," "finding it to be both empirically grounded and profoundly relevant to the emotional well-being" of Alice and Liam. This testimony would have been likely to have made a difference at the October 2020 trial.

¶84 During the remand hearing, Expert acknowledged that termination of parental rights followed by adoption does provide "legal finality." But she discussed at some length the emotional costs of achieving legal finality in this way, noting that adoption "can also introduce profound experiences of loss," which comes in two forms: "definitive loss" and "ambiguous loss." Definitive loss is "the legal and physical separation from their biological parents (and in this case, biological siblings)." Ambiguous loss is "a psychological state of unresolved grief where the loved one remains psychologically present but physically absent." Regarding ambiguous loss, Expert discussed several studies indicating that adopted children face "increased risk of juvenile delinquency" and "suicidality" relative to "their non-adopted peers" and indicating that "adoption is not a singular event but a lifelong process marked by recurring developmental challenges related to loss, identity, and belonging." Expert discussed ways in which these feelings of loss can be managed and treated.

¶85 But Expert characterized adoption as, in many cases, "a preventable harm," and she opined that, where possible, adoption and its associated "termination of parental rights should never happen if there is a safe viable alternative that will give a child legal permanency and a permanent connection to their biological family," because "the future risk of harm associated with termination of parental rights and adoption far outweighs the temporary heartache of adjusting placements." And Expert described "literature and a lot of researchers who say that generally it is in the best interest of the child, and society, for parental rights not to be terminated if there's ever a less-drastic alternative to it."

¶86 Testimony like this was not presented at the October 2020 trial, because Appointed Counsel didn't file pretrial disclosures and didn't seek a continuance once it became apparent that the State would seek to separate the Children. And especially given the weight the remand court afforded this testimony, it is apparent that this testimony would likely have made a difference at that trial. As with the sibling-bonds issue, *see supra* ¶ 75, evidence on these topics was also identified as an evidentiary lacuna by our supreme court, which noted that the record from the October 2020 trial "contain[ed] no evidence supporting the idea that termination would risk causing Alice or Liam long-term trauma, either from ambiguous loss or otherwise." *In re A.H.*, 2024 UT 26, ¶ 49. Expert's testimony filled this gap by presenting precisely the evidence that our supreme court found lacking.

¶87 Despite the significant weight the remand court appeared to give the new testimony on all of these fronts, the State and the GAL nevertheless contend that none of this new testimony would have made a difference to the outcome of the October 2020 trial, and they make three arguments in this regard.

¶88 First, the State argues that Father was not prejudiced by the exclusion of Siblings' testimony, because Siblings "cannot speak to the experience of" Alice and Liam and can only testify about whether *they* felt a strong bond to Alice and Liam. As the State puts it, Siblings "cannot speak to the experience of" Alice and Liam, and even if they could, "their life experiences within the family are markedly different from those of" Alice and Liam. We acknowledge that fact witnesses can only ever speak to their own experiences and their own feelings, and that Siblings therefore cannot testify directly about whether Alice and Liam feel (or felt, in 2020) a strong bond with the other members of the family. But we nevertheless agree with Father's assertion that "[b]onds between people are inherently bilateral" and that "[e]vidence of an older siblings' bond with a younger sibling is at least probative as to the younger sibling's bond with the older sibling." We

likewise agree with Father's statement that juvenile courts "routinely rely on testimony of parents, foster parents, therapists, friends, caseworkers, and siblings to determine the [strength of the] bonds between a particular child and those around them." Especially given the court's reaction to and findings about Siblings' testimony, we think that testimony was likely to have made a difference to the outcome of the juvenile court's original findings about the strength of the bonds between the Children.

¶89 Second, both the State and the GAL make a similar argument, pointing out that a best-interest determination must be "child-specific" and "considered from the particular child's point of view and not from the point of view of the child's siblings." We acknowledge that the question presented concerns the best interest of Alice and Liam, and not the other five Siblings. But as already noted, in assessing the best interest of a child, it is common for a court to hear testimony from other family members, including siblings and parents.

¶90 Third, the State asserts that Expert's testimony would not have made a difference to the juvenile court's original termination decision. The State argues that although Expert may have been qualified, she had never met or examined Alice and Liam, and her testimony presupposes the idea that Grandparents and Alice and Liam's foster family would be cooperative in a therapeutic transition. The State points out that Expert testified that any successful transition "would require a carefully staged transition with the full cooperation of both the current foster parents as well as the Parents' family." And the State argues that this sort of transition would also "require an immense expenditure of resources" across states and over a "substantial span of time."

¶91 But while these things may be true, they do not mean that Expert's testimony wasn't extremely relevant and likely to have made a difference if it had been presented at trial. First of all, forensic examinations are common, and findings from such

examinations are often presented during trials; the fact that Expert had not met or examined Alice or Liam is not something that renders her testimony irrelevant. And second, the potential complexity of a gradual transition in this case does not eliminate it as a possibility.

¶92 Regarding Expert's testimony more generally, it would be one thing if the remand court had found Expert to be not credible, or if it had found her analysis to be unpersuasive. But that was emphatically not the case. In an especially passionate and comprehensive series of findings, the remand court made clear that it was impressed with Expert. And as noted, Expert's testimony helped fill two important evidentiary holes identified by our supreme court in its decision. We are persuaded that, on balance, Expert's testimony would have been likely to have made a difference to the outcome of the October 2020 trial.

¶93 In the end, Father has shown that Retained Counsel's and Appointed Counsel's deficient performance did indeed prejudice him at trial. Accordingly, Father has made the necessary showings on both parts of the ineffective assistance test.

CONCLUSION

¶94 For the reasons discussed, we conclude that Retained Counsel and Appointed Counsel rendered deficient performance and that Father was prejudiced thereby. On this basis, we again vacate the juvenile court's original order terminating Father's rights regarding Alice and Liam, and we once again remand this matter to the juvenile court, this time for such additional proceedings as may be appropriate, including a new trial.

_____